*In re* S.B. *et al.*, Minors, Respondents-Appellees (The People of the State of Illinois, Petitioner-Appellee, v. Marilyn D. *et al.*, Respondents-Appellants).

First District (1st Division)   Nos. 1—03—0867, 1—03—0920 cons.

Opinion filed April 5, 2004.

---

Edwin A. Burnette, Public Defender, of Chicago (Michael Davidson, Assistant Public Defender, of counsel), for appellant Marilyn D.

Thomas J. Esler, of Skokie, for appellant Stephen B.

Richard A. Devine, State's Attorney, of Chicago (Renee Goldfarb, James E. Fitzgerald, and Peter Maltese, Assistant State's Attorneys, of counsel), for the People.

Patrick T. Murphy, Public Guardian, of Chicago (Chuck Golbert and James Griffin, of counsel), guardian *ad litem*.

JUSTICE McNULTY delivered the opinion of the court.

Respondents Marilyn D. and Stephen B. appeal orders of the circuit court of Cook County finding them to be unfit parents and terminating their parental rights relating to their three minor children. We affirm.

In July 1997, the office of the Cook County State's Attorney filed petitions alleging that the respondents' three children, a six-year-old girl and three- and one-year-old boys, were abused and neglected in that they lived in a vacant apartment building which lacked furniture and utilities; they were inadequately fed, clothed and bathed; the three-year-old was allowed to access and sleep unsupervised on the building's dangerous fire escape; the mother was an admitted alcohol and drug user; and the two younger children had been born with drugs in their systems. The trial court removed the children from Marilyn's care and granted the Department of Children and Family Services (DCFS) temporary custody and the right to place the children. The six-year-old girl was placed in a foster home in August 1997 and was joined by her younger brothers the following month. Following a January 1998 hearing, the court found the children to be neglected and abused, and in July 1998 declared them wards of the court. In October 1998 and September 1999, the court issued orders character-

izing the ultimate custodial goal for the children as "return home within 12 months."

In May 2000, as a result of the daughter's reports of a history of sexual abuse by Marilyn, the office of the Cook County public guardian sought to suspend the parents' visitation rights. The court gave DCFS the authority to allow or refuse visitation at its discretion until June 28, 2000, and on that date ordered that visitation be suspended "until such time as the court feels it would be in the minors' best interest."

In August 2001, the court established a new long-term custody goal for the children: "substitute care pending court determination of parental rights." In May 2002, the State, alleging parental unfitness, petitioned for the appointment of a guardian for the children who would have the right to consent to their adoption.

The court found Marilyn unfit under several provisions of the Adoption Act (750 ILCS 50/1 *et seq.* (West 2002)): for failure to maintain a reasonable degree of interest, concern or responsibility as to the welfare of the children (750 ILCS 50/1D(b) (West 2002)); for extreme and repeated cruelty to the oldest daughter (750 ILCS 50/1D(e) (West 2002)); for failure to protect the children from conditions in their environment that were injurious to their welfare (750 ILCS 50/1D(g) (West 2002)); for depravity (750 ILCS 50/1D(i) (West 2002)); and for failure to make reasonable efforts to correct the conditions that caused the children's removal or reasonable progress toward their return home (750 ILCS 50/1D(m) (West 2002)). Stephen, who had lived apart from Marilyn and the children since approximately one year before the July 1997 filing of the original neglect petition, was found unfit for failure to maintain a reasonable degree of interest, concern and responsibility and for failure to make reasonable efforts to correct the conditions causing removal of the children or reasonable progress toward their return home. Having found both parents unfit, the court held a hearing to determine the custodial option that would be in the best interest of the children. The court found the evidence to be "overwhelming" that it was in the best interest of the children that the parents' rights be terminated and a guardian with the right to consent to adoption be appointed for the children. The parents' separate appeals have been consolidated here.

■ Each parent argues that the trial court's unfitness findings were erroneous. Our analysis of this argument is guided by well-settled principles of review. The State's allegation of parental unfitness will be sustained if proved by clear and convincing evidence; the trial court's finding on the fitness issue is properly reversed on review only if it was contrary to the manifest weight of the evidence, *i.e.*, if the op-

posite conclusion was clearly evident. *In re C.N.*, 196 Ill. 2d 181, 208 (2001). A finding of parental unfitness may be based on evidence sufficient to support any single statutory ground, even if the evidence is not sufficient to support the other grounds alleged. *In re A.M.*, 294 Ill. App. 3d 616, 624 (1998). In the instant case, we believe that the evidence presented to the trial court was unquestionably sufficient to support a finding of unfitness for each parent.

■ The trial court heard evidence that Marilyn lived with the children in an abandoned apartment building with no utilities until they were removed from her custody in July 1997. The middle child, a boy age three at the time of removal, was underweight and malnourished. He and his one-year-old brother had both been born with narcotics in their systems. The three-year-old was allowed to wander onto and sleep upon the fire escape of the abandoned building without adult supervision. The eldest child, a girl age six at the time of removal, reported to adults that the children were left alone for days at a time without food, and that she was forced to provide care for herself and her younger brothers during such periods. An examining physician testified that she bore welts and scars on her back which were suggestive of physical abuse. The middle son also bore such scars, and both children reported repeated beatings by Marilyn.

Upon placement in a foster home, the girl displayed overt and aggressively sexual behavior unusual for a child her age; she ultimately confessed to her foster mother that Marilyn had forced her to perform sexual acts on numerous men in exchange for money to support her drug habit. The girl also reported Marilyn's sexual abuse to a psychologist, providing details about numerous occasions of forced sex acts, including descriptions of incidents during which she or her then three-year-old brother was forced to perform such acts with strangers, and incidents in which her brother was forced to perform such acts on their infant brother. The children's psychologist testified that the middle sibling offered similar accounts of sexual abuse, and that he and his sister both mimicked sexual motions and used sexual terminology in ways not commonly observed in children so young. Both children were able to arrange anatomically correct dolls in sexual positions to an unusual extent.

The children's foster mother testified that from their arrival in her home in August and September 1997 until the trial court's suspension of visitation in May 2000, Marilyn visited the children several times, but also missed numerous scheduled visits. One of her visits was terminated by a DCFS social worker when he noticed signs that she was under the influence of alcohol. Stephen visited twice. Marilyn sent gifts to the children for Christmas on one occasion, but the

children otherwise received no gifts, cards, letters or financial support from either Marilyn or Stephen.

Neither parent successfully completed the social service programs recommended as steps toward return of the children to their custody. In the October 1998 order establishing a return home as a permanent custody goal for the children, the trial court found that Marilyn had "made substantial progress" toward the children's return home and was making progress in her services. DCFS support of the family apparently lapsed following that order, however. In April 1999 Marilyn filed a motion to compel services, alleging that she had completed inpatient treatment and a parenting course, that she had started outpatient treatment and was attending Narcotics Anonymous and Alcoholics Anonymous meetings, but that since the court's October 1998 order, she "received no regular visitation, no referrals, assessments, assistance" and was not in contact with her caseworker despite calling him "at least weekly." In May 1999, the trial court entered an order requiring DCFS to assist Marilyn in referrals and completion of services. Although she was assigned to programs in 2000, she apparently stopped attending them. She missed or failed her scheduled drug tests in 2000, including a test that revealed the presence of narcotics in her system during a subsequent pregnancy that year. According to the testimony of one of the social workers assigned to the family, Marilyn admitted that she was not able to regain custody of the children because she continued to relapse into drug usage, but denied that she had done anything improper in her handling of the children before their removal, and admitted that she was refusing to submit to a substance addiction treatment program. She saw nothing wrong with housing the children in an abandoned building.

As previously noted, Stephen had lived apart from the family for approximately one year before they were removed from Marilyn's custody. None of the evidence suggested that he had committed any sexual improprieties with any of the children. He did not complete any of the instruction or counseling recommended for him, and despite being hospitalized for mental illness, he was not following his psychiatrist's recommendation to take medication. According to the testimony of a social worker assigned to the family, Stephen admitted to her that he thought that the foster mother should be allowed to adopt the children. However, after agreeing to sign consents for the process, he failed to appear at the December 2001 court hearing at which the documents were to be presented to him and had no further contact with the family's assigned social workers.

We believe that the testimony presented to the trial court firmly establishes the grounds for unfitness alleged against each parent.

Marilyn's failure to remedy the conditions that led to the removal of the children or to make progress toward their return home is demonstrated by her denial of any improprieties in her care for the children, her admitted refusal to submit to substance abuse treatment, and her relapse into drug usage even during her new pregnancy. Her failure to maintain a reasonable degree of interest, concern or responsibility for the welfare of the children is sufficiently demonstrated by her sporadic visitation during the period between their removal from her custody and the trial court's suspension of all parental visitation in May 2000. Since parental conduct that led to the initial removal of the children may also serve as a basis for a finding of unfitness (*In re C.W.*, 199 Ill. 2d 198, 216 (2002)), the trial court's findings of insufficient interest, concern or responsibility for the children's welfare and her failure to protect them from injurious conditions are further supported by the evidence of Marilyn's long-term absences and substandard care and feeding of her sons and daughter. Evidence of her preremoval conduct also conclusively establishes her cruelty to the children in the form of beatings of the two older children. Similarly, we believe that the " 'inherent deficiency of moral sense and rectitude' " required by the Adoption Act's "depravity" provision (*In re Abdullah*, 85 Ill. 2d 300, 305 (1981), quoting *Stalder v. Stone*, 412 Ill. 488, 498 (1952)) is equally well established by the evidence of her repeated subjection of her children to sexual acts to raise money for drugs.

Marilyn characterizes the testimony regarding the alleged sexual abuse as uncorroborated and therefore insufficient to support a finding of depravity. This characterization, in our view, is contrary to the facts of record. Evidence of her sexual abuse of the children was established not merely by the report of a single accuser, repeated to several different witnesses; rather, the two older children each described similar acts to multiple witnesses, each thus corroborating the other. Marilyn also argues that the generally disturbed behavior of the two older children does not corroborate the allegations of abuse, noting witness testimony that such behavior is equally consistent with both a history of sexual abuse and the displacement trauma caused by a move to a foster home. However, this notation does not address the more significant element of corroborative behavior relied upon by the trial court: each of the two older children displayed detailed knowledge of sexual terminology and mechanics not common to children of their age. Marilyn further contends that the testimony of her acts of cruelty and depravity was unacceptably uncertain, since her daughter recanted the accusations. We disagree. The witness who reported the daughter's recantation also noted that denial of the occurrence of

traumatic abuse was common among young children and that Marilyn's daughter, though at times denying any abuse, uniformly returned to her original assertion that the abuse did happen. Since inconsistencies in testimony do not negate its credibility, and are merely elements to be considered by the trier of fact in weighing the testimony, we do not believe that the inconsistencies cited by Marilyn provide a basis for undermining the trial court's finding. *In re Santiago*, 87 Ill. App. 3d 605, 608 (1980).

Marilyn's additional assertions of error are joined by Stephen: both parents claim that the findings of their unfitness were improper because of systemic frustration of their efforts to care for their children. The parents point out that DCFS failed to provide services for the family for an extended period and that the trial court order indefinitely suspending visitation forestalled their care-giving efforts. This court has been offered no explanation for the extended period of DCFS unresponsiveness; the agency's failure to provide services to an extent that required Marilyn's petition to the court for intervention appears to be both regrettable and unacceptable. This failure does not shield the actions of the parents from scrutiny, however. When official action frustrates parental efforts, their fitness will be judged by actions that show their intent, rather than by their ultimate success. *In re Bredendick*, 74 Ill. App. 3d 946, 954 (1979). In the instant case, the trial court heard evidence that the children lacked adequate food and shelter and that Stephen had not lived with them for approximately one year before their entry into the court system. In the period of more than two years during which he was entitled to visit the children at the home of their foster mother, including the period of agency inattention, Stephen visited only twice. Marilyn, though visiting more, still missed many of the scheduled visits, according to the children's foster mother. Neither parent presented any evidence of other attempts to maintain contact with the children before or after visits were suspended. When social services were resumed, neither parent successfully completed recommended programs. It is thus apparent that both parents displayed the characteristics providing the basis for findings of unfitness before, during and after the onset of the disabling acts and omissions of DCFS and the trial court. Given these facts, we cannot conclude that the trial court's findings of unfitness were improper.

Both parents also argue that termination of their rights was not demonstrated to be in the best interests of the children. As a preliminary matter, Marilyn argues that the trial court improperly excluded from the best interest hearing testimony about her social worker's October 2002 evaluation of her performance against her

most recent service plan. That evaluation indicated that during the duration of that plan, Marilyn had passed drug and alcohol tests and followed the recommendations of the psychologist assigned to her case at that time and kept in touch with her social worker. Marilyn attempted to introduce such testimony through cross-examination of her social worker, who had testified for the State that the termination of the parental rights of Marilyn and Stephen was in the children's best interest. The trial court reasoned that once Marilyn was found unfit, her subsequent conduct was irrelevant to the best interest determination. We believe that this reasoning is inconsistent with the analysis of our supreme court in *In re D.L.*, 191 Ill. 2d 1, 12-13 (2000), which indicates that parental behavior following an adjudication of abuse or neglect is potentially relevant and admissible at a best interest hearing.

Errors in limitation of cross-examination only require reversal upon a showing of manifest prejudice to the aggrieved party, however. *McDonnell v. McPartlin*, 192 Ill. 2d 505, 533 (2000). We believe that the trial court's exclusion of evidence of Marilyn's service plan performance resulted in no prejudice in the instant case. A parent's completion of recommended social services does not demonstrate that preservation of her parental rights is in the best interest of her child. *In re J.J.*, 327 Ill. App. 3d 70, 78 (2001). Any success Marilyn may have achieved in relation to a portion of one of her service plans would therefore have been merely one factor to be considered in determining the best interests of the children.

Consideration of other factors relating to the children's best interests clearly outweighed the impact of Marilyn's service plan performance. At the time of the best interest hearing, the children had been in the home of their foster mother for more than five years. The children's social worker reported that the foster mother was effectively attending to the needs of all three children: the two older children were supervised in all their interactions with other children, attended regular therapy sessions, and received prescribed medication for emotional disorders. Both children attended special education programs. The youngest child also attended special education classes, and was considered to be a candidate for therapy at a more advanced age, but had no medication needs. All three children referred to the foster mother as "Mom," and the two older children both reported that they wanted to be adopted by her.

In our view, the foregoing evidence establishes that Marilyn's service plan evaluation, even if it had been properly admitted, would not have altered the court's judgment that termination of her parental rights was in the best interests of the children. We therefore conclude

that exclusion of that evidence, though erroneous, was harmless. Given this conclusion, we find no basis for the parents' claims that termination of their rights in the children's best interests was contrary to the manifest weight of the evidence.

For the foregoing reasons, we affirm the judgments of the circuit court of Cook County.

Affirmed.

O'MALLEY, P.J., and McBRIDE, J., concur.