# Illinois Official Reports

## Appellate Court

*In re J.B.*, 2014 IL App (1st) 140773

| | |
|---|---|
| Appellate Court Caption | *In re* J.B. AND J.H., Minors (The People of the State of Illinois, Petitioner-Appellee, v. Natasha B., Respondent-Appellant). |
| District & No. | First District, Fifth Division<br>Docket No. 1-14-0773 |
| Filed | October 10, 2014 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | The trial court's rulings that respondent's minor children were neglected and abused, that she was unfit and that it was in the children's best interests to terminate her parental rights were upheld on appeal over her contentions that the finding of unfitness was against the manifest weight of the evidence and that her due process rights were violated when the facts that she was incarcerated, was refused any services, and was denied visitation with her children were used to establish her unfitness, since respondent waived her constitutional challenge by raising it for the first time on appeal, and even if the claim had been considered, it would have been rejected on the ground that the finding of unfitness was not based on the time period when respondent was incarcerated and the orders prohibiting her from having contact with the children were in effect; furthermore, the finding of unfitness was not against the manifest weight of the evidence in view of the severe physical beating she administered to one of the children and the evidence of prior abuse, extreme and repeated cruelty, and the failure to protect the children from conditions in their environment that were injurious to their welfare, especially when only one basis for a finding of unfitness is all that is necessary. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, Nos. 12-JA-1059, 12-JA-1060; the Hon. Bernard J. Sarley, Judge, presiding. |

| | |
|---|---|
| Judgment | Affirmed. |
| | |
| Counsel on Appeal | Abishi C. Cunningham, Jr., Public Defender, of Chicago (Shevon Fullman, Assistant Public Defender, of counsel), for appellant. |
| | |
| | Anita M. Alvarez, State's Attorney, of Chicago (Alan J. Spellberg, Mary Needham, and Nancy Kisicki, Assistant State's Attorneys, of counsel), for the People. |
| | |
| | Robert F. Harris, Public Guardian, of Chicago (Kass A. Plain and Christopher Williams, of counsel), guardian *ad litem*. |
| | |
| Panel | PRESIDING JUSTICE PALMER delivered the judgment of the court, with opinion. Justices McBride and Gordon concurred in the judgment and opinion. |

**OPINION**

¶ 1    Respondent, Natasha B., is the biological mother of minors, J.H., born on November 20, 2003, and J.B., born on November 4, 2009. Respondent appeals the trial court's November 14, 2013, ruling finding the two minors neglected and abused and adjudicating respondent unfit, and the trial court's March 17, 2014, order finding that it was in the best interests of the minors to terminate respondent's parental rights. On appeal, respondent asserts that her due process rights were violated because she was incarcerated, she was refused any services, and she was denied visitation with her children, and these facts were used as evidence to establish unfitness. She also contends that the trial court's findings of unfitness were against the manifest weight of the evidence.[1] For the following reasons, we affirm.

¶ 2                                        I. BACKGROUND

¶ 3    On October 18, 2012, the State filed a petition for adjudication of wardship for the minors and a petition for temporary custody, alleging that they were abused and neglected. In J.H.'s petition, the State alleged that, pursuant to the Juvenile Court Act of 1987 (705 ILCS 405/1-1 *et seq.* (West 2012)), J.H. was (1) neglected based on an environment injurious to his welfare, (2) abused based on a substantial risk of physical injury, (3) neglected as to necessary care, and (4) physically abused. 705 ILCS 405/2-3(1)(a), (1)(b), (2)(i), (2)(ii) (West 2012). With respect

_____

[1]The minors' putative fathers never appealed and were defaulted by the trial court, and are not parties to this appeal.

to J.B., the petition alleged that he was neglected based on an environment injurious to his welfare and abused based on a substantial risk of physical injury. 705 ILCS 405/2-3(1)(b), (2)(ii) (West 2012). The petitions alleged that on approximately October 13, 2012, J.H. "presented to Ingalls Memorial Hospital with leg pain and swelling as well as facial contusions" and he was diagnosed with an "oblique femur fracture and fracture to his right hip," injuries which medical personnel indicated were "inflicted trauma and non-accidental." The petitions alleged that respondent admitted to causing J.H.'s injuries.

¶ 4    The trial court placed both minors under the temporary custody of the Department of Children and Family Services (DCFS). The trial court also entered a no-contact order against respondent and an order denying visits between respondent and the minors. The record reflects that, as a result of the incident giving rise to DCFS intervention, respondent was incarcerated in the Cook County jail and criminal charges were filed against her.

¶ 5    The State later moved to amend the petition to seek permanent termination of parental rights at disposition and appointment of a guardian with the right to consent to adoption. The State also moved to add the grounds of torture to J.H.'s petition based on the allegation that respondent forced J.H. to do leg squats as a form of punishment, punched him and threw him to the floor when he could not do any more, stood on his leg and choked him until he almost lost consciousness, and then left him "immobile on the bathroom floor while she went to bed." The trial court granted both motions.

¶ 6    The State also submitted a request for admissions of fact pursuant to Illinois Supreme Court Rule 216 (eff. Jan. 1, 2011) regarding a written statement that respondent gave to an Assistant State's Attorney (ASA) while she was at Riverdale police department on October 14, 2012, which concerned the battery of J.H. The requests for admissions were as follows: (1) respondent was present at the Riverdale police department on October 14, 2012; (2) she gave an oral statement regarding the battery of J.H. to an ASA and a detective; (3) she was "duly" advised of her *Miranda* rights before giving the statement; (4) she stated that she understood the *Miranda* warnings and wanted to give a statement; (5) the statement she gave was memorialized in writing by the ASA; (6) respondent was given the opportunity to review the written statement and make changes and did so; (7) she reviewed and signed each page of the statement indicating that the statement was true and accurate; (8) respondent's signature was on each page of the statement and her initials are next to any changes; and (9) the attached statement/exhibit accurately reflected the statement she gave. Respondent objected based on relevance, and the State then moved for the facts to be deemed admitted. The trial court held that the admissions were deemed admitted, but it struck the word "duly" from the third admission.

¶ 7    Respondent's written statement was attached to the State's request for admissions of fact. According to the statement, respondent indicated that she was living with the two minors and Sandra H., Thornton H., and Sheena H. Respondent indicated that J.B. came to her and told her that J.H. almost pulled down the television on him. However, J.H. denied this when she asked him about it. When he continued to deny it, respondent instructed him to do squats as a form of punishment in the hallway. Respondent indicated that J.H. complained that his legs hurt, but respondent informed him that they were "supposed to hurt." Respondent stated that she got up from her chair and instructed him to stop complaining and do the squats correctly, but he continued complaining. Respondent explained that she then grabbed J.H. by his shirt, brought him to the bathroom, and told him she was going to "whoop" him. She left and told J.B. to give

her his belt; J.B. refused to do so, at first. Respondent then returned to the bathroom with the belt and started struggling with J.H. Respondent indicated that J.H. asked if his "God-Granny" could "whoop" him instead, but respondent refused. Respondent indicated that she attempted to take off J.H.'s shorts and underpants, but he continued struggling. She held onto his shirt and was finally able to remove his clothing, and then "hit him once on his behind with the belt." Respondent related that J.H. then "slumped down" like "dead weight," and she tried to pull him up by his shirt. She became more frustrated and angry, so she pulled his "whole body up by his shirt with both of her hands and threw him to the floor of the bathroom," where he hit his head on a ledge near the bathtub. Respondent stated that she then "squatted over [J.H.] and she punched about his body many times." She did not remember if she choked him, but she did punch him on the leg and "sat on his leg." Respondent indicated that Sheena H. intervened at that point and stopped her. Respondent stated that her vision was blurred, her head hurt, and she was shaking, so she went to her room and lay down. She called to J.H. and told him to get up, but he yelled that he could not. She asked Sheena H. to help, but J.H. continued to cry and yell. Respondent indicated that she returned to the bathroom and saw him curled on the floor without his pants, and his right leg was swollen and "shifted a little bit." Respondent called 911. Respondent got clean pants and underpants for J.H., but she could not help dress him "because she felt so bad about what she had done to him," so she asked Sheena H. to dress him. She indicated that J.H. cried in pain while being dressed. When the paramedics and police arrived, respondent told police that J.H. hurt his leg while doing squats. However, respondent admitted to the ASA that this was not true, and she said it "because she didn't want to face the fact that she was the one who hurt him."

¶ 8                                 A. Adjudication and Unfitness Hearing

¶ 9        The adjudication and unfitness hearing occurred simultaneously over three days. The State admitted into evidence its request for admissions and the attached exhibit containing respondent's October 14, 2012, statement, along with J.H.'s medical records from the hospital.

¶ 10       Margo Cralle, an investigator for DCFS, was initially assigned to investigate the case and she spoke with J.B. on October 16, 2012. J.B. told her that he was two years old and his brother J.H. was in the hospital. J.B. "blurted out" that J.H. "gets whooped. She whoops him in the hallway." Cralle indicated that no marks or bruises were found on J.B.'s body. When she asked whether his mother "whips him," J.B. responded that he "doesn't get in trouble."

¶ 11       Harriett Holmes took over as the primary DCFS investigator. Holmes interviewed J.H. at the Advocate Children's Hospital in Oak Lawn, Illinois, on October 16, 2012. She observed that his left or right leg was bandaged and elevated in the air, he had a large bump on his forehead, a blackened left eye, a swollen right cheek, and scratches, bruises and contusions "all over his face." J.H. was "[v]ery, very sad" during the interview and spoke in a monotone voice. He appeared depressed and did not talk much except to answer her questions. His voice became more agitated when she asked about respondent.

¶ 12       Holmes testified that J.H. explained to her that he and J.B. were playing, and J.B. climbed up a bookshelf with a television on it and the television almost fell. J.B. left to tell respondent that J.H. almost knocked the television on him, and respondent came into the room and asked J.H. if this was true. J.H. denied it, and respondent stated that she did not believe him and that he "was going to have to do squats as a form of punishment." J.H. described to Holmes how he did the squats with his arms held out. Holmes testified that J.H. told respondent that it hurt to

- 4 -

do squats and he stopped doing them, but respondent "would punch him in the leg and make him continue," and she "said it's supposed to hurt, it's a punishment." Eventually, J.H. stopped doing the squats and respondent told him that he if did not continue, "he was going to get a whooping." Respondent told J.H. to go get a belt, and when he returned with one, she took him into the bathroom. Holmes testified that J.H. told her that respondent directed him to take off his pants, and then respondent "proceeded to whoop him, but he kept grabbing the belt." When he grabbed the belt, respondent punched or hit him with a closed fist on his face, arms, and chest. J.H. told Holmes that, at some point, respondent "picked him up by his collar and threw him down to the ground." J.H. indicated that respondent grabbed him by his shirt collar and her hands were around his throat, choking him. Further, when he landed on the ground, the side of his face hit the bathtub. Respondent continued to hit and punch him. J.H. told Holmes that he then "begged his mom to let God granny, who was the other person who lived in the home[,] whoop him." Respondent refused and continued to whip him, while J.H. continued to grab the belt. J.H. informed Holmes that "at that point mom grabbed–started punching him in the arm and the face, just all over, and was standing on top of his leg." She continued punching him all over with her fist while J.H. tried to get away, but "the more he squirmed, the more she hit him." J.H. told Holmes that at some point, the daughter of the godmother, "TT," came into the bathroom and "dragged" respondent off of him. Respondent told J.H. to get up and get dressed, but J.H. could not get up because his leg hurt badly. At that point, 911 was called and the paramedics arrived.

¶ 13      Holmes testified that she asked J.H. whether respondent had ever hit him before, and he responded that she "hits him a lot, all the time. But it had never been like what it was this time." J.H. also stated that "he hated his mother and that she didn't care about him." J.H. then pulled the covers over his head and refused to talk further with Holmes.

¶ 14      Holmes also interviewed respondent on October 16, 2012, at the Riverdale police station jail. Holmes testified that respondent admitted she "had a history of anger management issues and specifically with [J.H.]" She admitted hitting him, "but never anything like what" transpired in the current case. She admitted that the domestic violence had been going on for "years." Respondent explained to Holmes that when J.H. would anger her, "she would hit him with her fist in the chest or the arms" and tell him "to get away from her" because she "just didn't want to be bothered with him." Holmes testified that respondent was "[m]atter of fact" about this.

¶ 15      When Holmes asked respondent specifically about the incident at issue, respondent explained that she and the minors were living in the home of a friend of the family, which included the "God granny," and "Sandra," who was also called "TT." Respondent indicated that she was in a different room watching television when J.B. entered and told her that a television had almost fallen on him because J.H. "made him climb up on the bookcase." Respondent went into the other room and asked J.H. if this was true, but he denied it. Respondent did not believe J.H. and "she was going to make him do squats as a form of punishment." Holmes testified that respondent related that J.H. would do some squats, but then stop, and every time he stopped, she punched him on his leg with her fist to make him continue. Respondent stated that when J.H. told her that "it really hurts," she responded that "it's a form of punishment, it's supposed to hurt." Eventually, when J.H. completely stopped doing squats, she threatened to "get a belt and w[h]oop him." When he refused to do more squats, she got a

belt and took him in the bathroom, where she made him remove his pants and "proceeded to whoop him."

¶ 16    Holmes testified that respondent explained that as she tried to "whoop" him with the belt, J.H. kept grabbing the belt, which angered her even more, and so she began to punch him when he grabbed the belt. When he continued grabbing the belt, respondent explained to Holmes that she "grabbed him by his shirt, lifted him off his feet and through [*sic*] him on the floor," causing him to hit the side of his face on the bathtub. Respondent also stated that she tried to lift him up, but "he made himself like dead weight and so she couldn't," and she then continued trying to hit him with the belt. However, J.H. continued "squirming and grabbing the belt," which respondent indicated made her angrier. Respondent "started just hitting him and punching him." Respondent told Holmes that J.H. "begged her to let God granny whoop him," but respondent refused because "he got in trouble with her and she was going to whoop him." Holmes testified that respondent related that as J.H. continued grabbing the belt, respondent "was so angry that she started just punching him on his arms, on his body, just everywhere. And at that point in time she was standing on top of his leg just punching him on [*sic*] choking him." Respondent explained to Holmes that she was choking him by the collar of his shirt.

¶ 17    Holmes testified that respondent stated that at that point, the "God granny's daughter came in the room and dragged her off of [J.H.]" Respondent told J.H. to get up and get dressed, and then she left the bathroom and laid down on a bed for about 10 minutes. Respondent told Holmes that "Sandra *** came to her and told her that [J.H.] was still in the bathroom on the floor." Respondent instructed her to tell J.H. to get up and get dressed, but she returned after a few minutes and told respondent that J.H. said "he can't get up, he can't move his leg." Respondent told Holmes that she "did not get up and go check on him, because she admitted that she knew she had hurt him and she didn't want to see him like that." Respondent indicated that Sandra H. dressed J.H. and called 911. Respondent related to Holmes that when the paramedics arrived, she told them that J.H. had fallen. Holmes testified that respondent stated that J.H. "just makes her so mad and angry. But she was sorry, and she didn't mean to hurt her child like that." Holmes testified that respondent became more agitated and irritated the more they talked about J.H. Holmes affirmed that this was an "A sequence case."

¶ 18    Dr. Guneesh Saluja, an emergency medical doctor at Ingalls Hospital, testified that J.H. came to the emergency room on October 13, 2012. J.H., who was eight years old at the time, had bruises on the left side of his face and forehead, and his right thigh was swollen and tender to the touch, and it was deformed or bent at a place where there was no joint. When Saluja asked how J.H. received the injuries, J.H. reported that he was squatting and fell. Saluja testified that respondent was present during this initial conversation. Saluja asked respondent how the injuries occurred, and she likewise told him that J.H. was squatting and fell. Saluja ordered X-rays of J.H.'s leg and pelvis, and a CT scan of his head.

¶ 19    According to Saluja, the X-ray of J.H.'s right femur bone showed two fractures. One was a proximal femur fracture close to the hip that was completely displaced, meaning that the edges of the fracture were not in contact with each other. Saluja indicated that this was an acute fracture and was "very recent." He opined that it could not have been caused from J.H. doing squats and falling over, because the femur is "a big bone. It needs [a] high impact to break." The second fracture was a distal femur fracture, which was closer to the knee, minimally displaced, and showed bony sclerosis. Saluja explained that the edges of the fracture were not sharp anymore and showed calcification, an indication that "[i]t had been there for a few days."

- 6 -

Saluja concluded that the distal femur fracture could not have occurred on October 13, 2012, and it also could not have been caused by the minor falling over accidentally, as such a fracture would not have been caused by "a minor trauma." Saluja concluded that the two fractures occurred at different times.

¶ 20 The X-ray of J.H.'s pelvis revealed a "nondisplaced inferior pubic rami fracture on the right side." The fracture had no callus formation, which indicated that it could either be a new injury or that "the bone is not healing at all." Saluja testified that the injury was not consistent with an eight-year-old doing squats and falling, because the bone was "deep seeded [*sic*] with a lot of tissue around it, so a minor fall should not break that bone."

¶ 21 Saluja testified that he and a nurse spoke with J.H. after reviewing the X-rays, without respondent present, and J.H. gave a different explanation for his injuries. J.H. told the nurse that "his mother sat on his leg and hit him with a belt, and then picked him up and threw him on the floor." Saluja opined that this explanation was consistent with J.H.'s injuries, with the exception of the distal femur fracture, which appeared to be a week to 10 days old. Saluja later reviewed respondent's written statement and opined that her description was consistent with J.H.'s facial bruising, pelvic fracture, and right proximal femur fracture, but not the distal femur fracture. Saluja opined that the distal femur fracture was older. It would have caused pain, but J.H. may have still been able to walk, albeit with a limp, because the fracture was only "mildly displaced."

¶ 22 Riverdale police detective sergeant Willie Darkried was summoned to Ingalls Hospital on October 13, 2012, and he found J.H. in the emergency room, "screaming," and stating, " 'I'm sorry for whatever I did. Please don't hurt me anymore.' " J.H. appeared to be in intense pain. Darkried noticed multiple large bruises and red marks on J.H.'s face, his right leg was swollen, and his right thigh appeared higher than the other side.[2]

¶ 23 Darkried testified that he interviewed J.H. on October 15, 2012, at Hope Children's Hospital, with an ASA present. J.H. told Darkried that after he almost knocked a television over, J.B. reported this to respondent, who then took J.H. "into the hallway to make him do squats as punishment." J.H. stated that he eventually became fatigued and was unable to continue. This upset respondent, who then took him into the bathroom and "threw him on the floor," where "a part of his body hit a cabinet in the bathroom." J.H. told Darkried that respondent then "sat on his legs" with her full weight and "punched him in the face with both hands." She then "placed both hands around his throat, and he remembers almost throwing up."

¶ 24 Elena Padilla, a caseworker for Illinois Mentor, was assigned to the minors' cases in January 2013. She testified that respondent was incarcerated in Cook County department of corrections and has a criminal case pending against her. Padilla testified that respondent has never engaged in or completed any reunification services, and if respondent was ever to be reunited with the minors, she would be in need of such services. Padilla testified that a social worker informed her that respondent "would not be able to engage in services at Cook County because they will not be able to provide the services that we were requesting through the service plan."

¶ 25 Following the presentation of this evidence, the parties gave closing arguments on November 14, 2013. The trial court adjudicated the minors neglected and abused. The court

---

[2]Two photographs showing J.H.'s facial injuries were admitted into evidence by the State.

held that the evidence established that respondent severely beat J.H., based on respondent's statements and J.H.'s statements about what happened, and the medical evidence supported that J.H.'s injuries were consistent with the statements regarding the beating, and inconsistent with the exculpatory statements offered by the mother. The trial court found that clear and convincing evidence established that respondent tortured J.H. by inflicting "excruciating pain and the infliction of severe physical pain as a means of punishment or coercion," and the State had also thereby proven abuse based on substantial risk of injury. With regard to neglect, the trial court held that respondent failed to provide a safe home and instead severely tortured and beat J.H. The court also held there was evidence of prior physical abuse based on the older fracture in J.H.'s leg and J.H.'s statement that respondent hit him a lot and all the time. With respect to J.B., the trial court held that based on the fact that he lived in the same household as J.H., the State had proven that J.B. was at substantial risk of physical injury and subjected to an injurious environment.

¶ 26    With regard to parental fitness, the trial court found by clear and convincing evidence that respondent was unfit as to both minors for failure to show a reasonable degree of interest, concern, or responsibility for the minors' welfare by virtue of the severe beating she inflicted on J.H. The court also found respondent unfit for failure to protect both minors from conditions injurious to their welfare. As to unfitness based on depravity, the court held that a criminal conviction was not required to prove depravity, and held that respondent's severe beating of J.H. established that she acted in a depraved manner. The court noted that there was no evidence that J.H. was not limping before the October 13, 2012, incident, and no evidence contradicted Saluja's testimony regarding the older fracture. The court also held that the act of depravity as to J.H. was sufficient to prove depravity as to J.B., the other minor in the home. The trial court held that respondent was unfit based on extreme or repeatedly cruelty as to J.H. only, citing the same reasons that it held torture was proven. The trial court entered adjudication and unfitness orders reflecting these rulings on the same date.[3]

¶ 27                        B. Disposition and Best Interests Hearing

¶ 28    On March 17, 2014, the trial court conducted a consolidated disposition and best interests hearing.

¶ 29    Padilla, the DCFS caseworker for the minors, testified that respondent was currently incarcerated and needed reunification services if she were to ever reunify with the minors, including a parenting capacity assessment, a psychological evaluation, domestic violence for perpetrators services, individual therapy, and family therapy. Padilla testified that the social worker for respondent's division informed her that respondent "will not be able to engage in any of those services while she was incarcerated at Cook County."

¶ 30    Padilla indicated that the minors were placed with their maternal grandmother, Cheryl W., in September 2013, which was their second placement after initially being placed in a non-relative foster home. Cheryl W. was assessed and found to be an appropriate caregiver after DCFS investigated whether she had known about the abuse before DCFS intervention. DCFS observed multiple supervised visitations with Cheryl W. and the minors, she denied knowing about the abuse, and the minors and Cheryl W. have a strong attachment. Padilla testified that Cheryl W. indicated that she would put the minors' interests above those of

---

[3]The trial court also found the minors' fathers unfit based on several grounds.

respondent. According to Padilla, J.H.'s eating habits, grades, and behavior have improved while living with Cheryl W. J.B. now uses the bathroom on his own and his behavior problems have diminished. Padilla's visits to the home showed that it was safe and appropriate, and neither minor reported any abuse or corporal punishment. Cheryl W. was able to meet J.H.'s medical needs. Padilla testified that Cheryl W. seemed committed to providing the minors with a permanent home, there was a bond between them, and J.H. expressed a desire to continue living with Cheryl W. Padilla recommended that Cheryl W. adopt them. Although J.B. was not currently enrolled in preschool, Padilla explained that there had been issues with DCFS approval of the two schools Cheryl W. had chosen. Padilla believed that Cheryl W. would manage to get J.B. enrolled in school with her help.

¶ 31        Ellen Tannenbaum, a therapist for Catholic Charities, testified that she treated the minors in this case during separate weekly sessions. Initially, J.H. cried, had tantrums "for hours on end," and functioned poorly in school. During his tantrums, J.H. sometimes hit his head against the wall or engaged in other self-injurious behavior. The tantrums improved more when visits with Cheryl W. began, and J.H. expressed a desire to live with her. Tannenbaum involved Cheryl W. in the therapy, and the minors began living with Cheryl W. in September 2013. When J.H. had his first tantrum after moving in with Cheryl W., she acted appropriately by calling Tannenbaum. Tannenbaum testified that Cheryl W. reported that the tantrum started when she asked J.H. to do his homework. Tannenbaum gave Cheryl W. the telephone number for a home-based assessment service, which Cheryl W. contacted. The service came to her home and stabilized the situation. Since that time, J.H. and Cheryl W. have not reported any more severe tantrums. Tannenbaum testified that Cheryl W. has been "fundamental" in reducing his tantrums. J.H. reported no corporal punishment by Cheryl W., and Cheryl W. was committed to using techniques other than physical punishment with both minors. Tannenbaum also testified that J.H. has processed respondent's abuse, although he "continues to see the incident where his leg was broken as exceptional" and particularly emotionally painful. She testified that she has started to discuss terminating therapy because J.H.'s functioning at school and home has improved "dramatically" and he reported less intrusive thoughts and anger regarding respondent and the abuse. Tannenbaum believed that Cheryl W. was committed to providing a permanent home and she provided appropriate emotional support for him.

¶ 32        With respect to J.B., Tannenbaum testified that he had behavioral problems, such as aggressive behavior and tantrums, in his first foster placement, but then moved in with Cheryl W. Cheryl W. and J.B. reported that he has not had a tantrum since moving in with her. Tannenbaum indicated that Cheryl W. calms J.B. down by placing him in a "time out," which was an appropriate discipline technique. Tannenbaum reported that J.B. was now "very bonded" to Cheryl W. and reported no physical abuse. Tannenbaum was contemplating terminating therapy. Tannenbaum testified that J.B. was not currently enrolled in school, despite being school age. Cheryl W. indicated that she applied for several schools, but preschools with Headstart programs were already full since it was late in the school year. Tannenbaum did not know whether this was a failing by DCFS or Cheryl W., but she was willing to continue therapy until he was enrolled.

¶ 33        Cheryl W. testified that she sought to have the minors live with her because she loved them and they needed her. Cheryl W. also testified that she wanted to adopt the minors because she loved them and they needed her. She testified that the minors were "very loveable, so all day long kissing and hugging. They're just very loveable, and I just give it back to them." She

participated in therapy sessions and she understood it was her responsibility to protect them and that there was a no-contact order against respondent. Cheryl W. testified that other than the severe tantrum J.H. had shortly after he came to live with her, when she called Tannenbaum and supportive services for assistance, he has not had a tantrum since. She talked with Tannenbaum about proper methods to calm him down and discipline him. She testified that she has a "great relationship" with J.H., he shows her affection, and she encourages him to talk about his feelings. With respect to J.B., Cheryl W. testified that, initially, he used profanity and had tantrums, but now he no longer used profanity. She testified that she enrolled J.B. in school in November 2013, but he had to leave because DCFS was not paying the school. She enrolled him in a different school, but was told by the school that it was not receiving payment from DCFS. She also tried to enroll J.B. in another school, but it was full. She testified that she was willing to have J.B. go to school and she was willing to work with DCFS to get him enrolled.

¶ 34     In ruling, the trial court took judicial notice of all of the evidence presented in the prior adjudication and unfitness proceeding. Citing its previous findings that the minors were abused and neglected and that respondent was unfit, and considering the evidence presented at the disposition and best interests hearing, the trial court held that it was in the minors' best interest to be adjudged wards of the court. Having previously found respondent unfit, the trial court determined that respondent was unfit and unable, for reasons other than financial circumstances, to care for, protect, train, or discipline the minors.[4] The court held that reasonable efforts to prevent removal had been made and services were unsuccessful. The court held that it was in the minors' best interests to be removed from the parents' custody and placed in the custody of the DCFS guardianship administrator.

¶ 35     Regarding the State's request to terminate parental rights, the trial court noted that it had previously adjudicated the minors to be neglected and abused, and the parents to be unfit, by clear and convincing evidence. Therefore, it concluded that it was in the minors' best interests to terminate parental rights based on the prior findings and the evidence presented at the disposition and best interests hearing. The court noted that there was a no-contact order against the mother based on the criminal case, the minors were well-cared for by Cheryl W., and their behavior had improved. The court also held that it was in the best interests of the minors to appoint a guardian with the right to consent to adoption.

¶ 36     On March 17, 2014, the trial court entered dispositional orders adjudicating the minors to be wards of the court, finding respondent unfit and unable to care for them, and placing them in the custody of a DCFS guardianship administrator. The court also entered termination orders, finding by clear and convincing evidence that respondent was unfit because she failed to maintain a reasonable degree of interest, concern, and responsibility in the minors; failed to protect the minors from conditions injurious to them; and behaved in a depraved manner toward them, and as to J.H. specifically, committed extreme or repeated cruelty. The orders further indicated that it was in the minors' best interests to terminate respondent's parental rights and to appoint a guardian with the right to consent to adoption. The court also entered an order that J.B. be enrolled in school.

¶ 37     Respondent appealed from both the trial court's November 14, 2013, order and the March 17, 2014, order.

---

[4]The court also found the two fathers unable, unwilling, and unfit.

II. ANALYSIS

¶ 39      On appeal, respondent first raises a constitutional challenge in arguing that the proceedings did not satisfy her due process rights. She asserts that she was prevented from visiting the minors and making progress toward reunification because she was incarcerated and the trial court entered a no-contact order and an order denying visitation, and these were unfairly used to support the finding that she failed to demonstrate a reasonable degree of interest, concern, or responsibility for the minors' welfare. Respondent argues that DCFS failed to provide her with any services toward the goal of reunification. Respondent suggests that the trial court could have considered the goal of private guardianship, but unfitness was essentially "a foregone conclusion" and the hearing was tainted.

¶ 40      Initially, we note that respondent raises her constitutional challenge for the first time on appeal. Because she failed to raise this argument in the trial court, it has been procedurally defaulted and waived. *In re Tamera W.*, 2012 IL App (2d) 111131, ¶ 29. See also *In re Jaron Z.*, 348 Ill. App. 3d 239, 255 (2004) (the respondent's argument regarding the constitutionality of the Adoption Act (750 ILCS 50/1(D) (West 2002)) was forfeited and waived because it was not raised at trial). Nevertheless, we further observe that forfeiture is a limitation on the parties, and not the court, and we may relax the rules of forfeiture where an issue impacts the fundamental fairness of a proceeding and address it under the plain error rubric. *Tamera W.*, 2012 IL App (2d) 111131, ¶ 30.

¶ 41      Even if we were to review respondent's argument, however, we would conclude that it has no merit.

¶ 42      "Parents have a fundamental due process right to the care, custody and control of their children, but that right is subject to termination." *In re A.W.*, 397 Ill. App. 3d 868, 872 (2010) (citing *In re M.H.*, 196 Ill. 2d 356 (2001)). The procedure to terminate a parent's rights "must comply with the requirement of procedural due process." *Id.* The overriding concern remains the best interests of the child. *Id.* Issues of constitutional law are reviewed *de novo*. *In re D.W.*, 214 Ill. 2d 289, 309 (2005).

¶ 43      In asserting that her due process rights were violated, respondent relies on *In re O.S.*, 364 Ill. App. 3d 628 (2006). In *O.S.*, the respondent mother was incarcerated for two years and was not permitted visits with her son during that time, and although she was permitted visitations with her son after she was released, the trial court ordered that the son was not allowed to know that respondent was his mother. *Id.* at 630-32. As a result, at the time of the best interests hearing, the son was more bonded with his foster parents than the respondent. *Id.* at 633. On appeal, the court agreed with the respondent that the decision to create the fiction that she was not his mother essentially "predetermined" the outcome of the case and "actively impeded the development of any parental bonding between [the] respondent and [the] son and frustrated one of the goals the legislature set in the Act." *Id.* at 636. The court held that, in assessing the child's best interests, any harm to the parent/child relationship "must be assessed absent artificial or coercive intervention of others into the bonding process." *Id.* at 637. As this was not possible in *O.S.*, the court held that a fundamental injustice had occurred. *Id.*

¶ 44      We find *O.S.* distinguishable from the present circumstances. In contrast to the case at bar, the parent's challenge in *O.S.* concerned the best interests hearing, and not the hearing to determine unfitness, which is the primary focus of respondent's argument on appeal here. *Id.* at 633. In further contrast from *O.S.*, nothing in the record here suggests that DCFS "actively impeded" respondent's bonding with the minors by creating a fiction or lying to them about

their mother. Rather, it appears from the record before us that services were not provided to respondent because they were unavailable in jail. "When official action frustrates parental efforts, their fitness will be judged by actions that show their intent, rather than by their ultimate success." *In re S.B.*, 348 Ill. App. 3d 61, 67 (2004).

¶ 45   Most importantly, although respondent asserts that a fundamental injustice occurred because she was prevented from visiting her children and DCFS failed to provide services, the trial court did not rely on this as a basis for finding the minors neglected and abused or finding respondent unfit. Rather, during the adjudication hearing, the trial court relied on respondent's physical abuse of J.H. in finding the minors neglected and abused. The court then found respondent unfit based on several grounds for both J.H. and J.B.: failure to maintain reasonable interest or concern, failure to protect conditions injurious to minor, and depravity, and, as to J.H. only, extreme or repeated cruelty. In finding respondent unfit, the court repeatedly cited the severe beating inflicted by respondent on J.H., along with other evidence of prior physical abuse of J.H. and the fact that J.B. was present in the home. For example, in finding respondent unfit for failing to maintain a reasonable degree of interest, concern, or responsibility in the minors, the court stated:

> "I can't think of a more clear way of showing lack of responsibility for welfare than to severely beat your child the way this minor was beaten in this case. *** She severely beat the child, and that clearly shows no possible concern or responsibility as to the child's welfare. And with regard to the minor, [J.B.], for [J.B.] to be in that household, the same applies to him."

¶ 46   Thus, the trial court did not base its finding of unfitness on the time period after the beating, during which she was incarcerated and the orders were in effect. In fact, the court did not reference the orders prohibiting contact with the minors and respondent's incarceration until the disposition and best interests hearing.[5]

¶ 47   Moreover, we disagree with respondent that her due process rights were violated because she was not given an opportunity to engage in DCFS services and remedy the circumstances which resulted in the petitions. The different bases of finding unfitness do not provide for a specific time period for a parent to remedy any conditions. See *In re Dominique W.*, 347 Ill. App. 3d 557, 567-68 (2004) (noting that the language of section 1(D)(b) (750 ILCS 50/1(D)(b) (West 2000)) "provides no *** evidentiary time frame" directing the court to consider only the time period before a petition is filed and that the legislature "included no evidentiary time limitation whatsoever"); *In re M.J.*, 314 Ill. App. 3d 649, 656 (2000) (same); *In re I.B.*, 397 Ill. App. 3d 335, 339 (2009) (rejecting the parent's claim that his due process rights were violated in not allowing him an opportunity to correct the conditions that led to the removal of his child under subsection 1(D)(e) (750 ILCS 50/1(D)(e) (West 2008)), for extreme or repeated cruelty to a child, because the language of that subsection "does not entitle a parent to a specific period of time before a trial court may find a parent unfit on this ground"); *In re C.W.*, 199 Ill. 2d 198, 216 (2002) (finding that the parent was not entitled to a period of time to correct the injurious environment before being found unfit under subsection 1(D)(g) (750 ILCS 50/1(D)(g) (West 1998))).

---

[5] Also, although respondent asserts that the trial court should have considered a "private guardianship," she failed to present this contention below and it has therefore been forfeited. *Tamera W.*, 2012 IL App (2d) 111131, ¶ 29.

¶ 48    Having found no constitutional due process violation, we next address her remaining claims on appeal in which she argues that the trial court's findings of unfitness were against the manifest weight of the evidence.

¶ 49    Pursuant to the Juvenile Court Act, the involuntary termination of parental rights involves a two-step process. *In re D.F.*, 201 Ill. 2d 476, 494 (2002). First, the State must prove by clear and convincing evidence that the parent is "unfit" as defined by section 1(D) of the Adoption Act. *Id.* at 494-95 (citing 750 ILCS 50/1(D) (West 1998)). Assuming the parent is found unfit, the circuit court must then consider whether it is in the best interests of the children to terminate parental rights. *Id.* at 495. "A parent's rights may be terminated if even a single alleged ground for unfitness is supported by clear and convincing evidence." *In re Gwynne P.*, 215 Ill. 2d 340, 349 (2005). "This means that, on review, if there is sufficient evidence to satisfy any one statutory ground we need not consider other findings of parental unfitness." *M.J.*, 314 Ill. App. 3d at 655. On appellate review, this court "will not disturb a finding of unfitness unless it is contrary to the manifest weight of the evidence and the record clearly demonstrates that the opposite result was proper." *In re Konstantinos H.*, 387 Ill. App. 3d 192, 203 (2008). We give great deference to the trial court's finding of unfitness, defer to the trial court's factual findings and credibility assessments, and will not re-weigh the evidence anew on appeal. *In re April C.*, 345 Ill. App. 3d 872, 889 (2004). Issues of statutory construction are reviewed *de novo*. *In re C.W.*, 199 Ill. 2d 198, 211 (2002). When interpreting the language of a statute, our goal is to give effect to the intent of the legislature by enforcing clear, unambiguous language. *Id.* at 211-12.

¶ 50    In the case at bar, the trial court held that respondent was unfit as to both minors pursuant to section 1(D)(b) for "[f]ailure to maintain a reasonable degree of interest, concern or responsibility as to the child's welfare." 750 ILCS 50/1(D)(b) (West 2012). Similar to her constitutional claim, respondent argues that she was never provided any DCFS services and was unable to contact the minors following the October 2013 incident because she was incarcerated and because of the no-contact orders.

¶ 51    Because subsection (b) is phrased in the disjunctive, "any of the three elements may be considered on its own as a basis for unfitness: the failure to maintain a reasonable degree of interest or concern or responsibility as to the child's welfare." *In re C.E.*, 406 Ill. App. 3d 97, 108 (2010). A parent's interest, concern, or responsibility toward the minor must be objectively reasonable, and the trial court should consider the parent's reasonable efforts along with any circumstances that may have made it difficult for the parent to show interest in or visit the minor. *In re Daphnie E.*, 368 Ill. App. 3d 1052, 1064-65 (2006); *In re Jaron Z.*, 348 Ill. App. 3d 239, 259-60 (2004).

¶ 52    As discussed, *supra*, the trial court did not base its finding of unfitness under section 1(D)(b) on the time period after the filing of the petitions, while respondent was incarcerated and the no-contact/no visitation orders were entered. As the State points out, the petitions never alleged a failure to make reasonable progress by failing to engage in DCFS services (as may have been relevant under section 1(D)(m) (750 ILCS 50/1(D)(m) (West 2012)). Instead, the trial court stated that respondent's lack of responsibility toward the minors' welfare under section 1(D)(b) was demonstrated by the fact that she severely beat J.H., and that J.B. was

- 13 -

present in the household at the time.[6] Considering that the trial court did not base its finding of unfitness under section 1(D)(b) on the time period after the beating, while respondent was incarcerated, or on the orders prohibiting contact or visitation with the minors, we reject respondent's challenge on that basis. As stated, petitions alleging unfitness pursuant to section 1(D)(b) are not statutorily limited to a specific time frame. *Dominique W.*, 347 Ill. App. 3d at 568; *M.J.*, 314 Ill. App. 3d at 656. Accordingly, the trial court properly considered the time period and respondent's conduct, *i.e.*, the severe physical beating of J.H. on October 13, 2012, and the evidence of prior abuse, without regard to the time period following the filing of the petition.

¶ 53    Respondent next challenges the unfitness finding as to J.H. only based on section 1(D)(e), for "[e]xtreme or repeated cruelty to the child." 750 ILCS 50/1(D)(e) (West 2012). Initially, we note that, having concluded that the finding of unfitness pursuant to section 1(D)(b) was supported by sufficient evidence, "we need not consider other findings of parental unfitness." *M.J.*, 314 Ill. App. 3d at 655. This court "may affirm the trial court's finding of unfitness under its conclusions with respect to" one subsection, even if we were to conclude that the evidence was insufficient to support allegations on other grounds. *In re Jaron Z.*, 348 Ill. App. 3d 239, 259 (2004).

¶ 54    Nevertheless, respondent asserts that the evidence did not support the finding of extreme or repeated cruelty as to J.H. because this was her first contact with DCFS, it involved only a single incident, it only amounted to "excessive corporal punishment," and there was no evidence that she caused J.H's older distal femur fracture. We observe that, while a parent generally has the right to "care for, control, and discipline" her own child, " '[d]iscipline' ha[s] been interpreted by the courts to extend to *reasonable* corporal punishment.' " (Emphasis in original.) *In re F.W.*, 261 Ill. App. 3d 894, 898 (1994). Although respondent contends that the incident on October 13, 2012, constituted only "excessive corporal punishment, not extreme cruelty," the evidence in this case belies her contention. Respondent inflicted a severe beating on eight-year-old J.H. which included choking him, lifting him up by his shirt collar and throwing him to the bathroom floor where he hit his head on the bathtub, removing his pants and underwear and beating him repeatedly with a belt, punching him repeatedly when he tried to block the blows of the belt, and then, when he continued to struggle, standing on his leg with her full weight while continuing to hit and punch him all over his body. That this was not merely an incidence of corporal punishment is also belied by the fact that respondent was so angry and intent on inflicting harm that she did not stop beating J.H. until someone else in the home intervened and "dragged" her off of him. The beating entailed such force that it broke J.H.'s femur bone and a bone in his pelvis. Saluja testified that the femur fracture required a "high impact," breaking the pelvic bone required more than just a "minor trauma." As further evidence that respondent's actions constituted extreme cruelty to her child, Darkried indicated that, while at the hospital, J.H. was in intense pain and screaming, " 'I'm sorry for whatever I did. Please don't hurt me anymore." The record also contradicts respondent's claim that she "immediately" obtained medical care for J.H. The record evidence showed that she left J.H.

---

[6]As to J.B., although there was no evidence that respondent physically abused J.B., "[e]vidence supporting a parent's unfitness toward one child may serve as the basis for termination of parental rights as to all children." *In re Janine M.A.*, 342 Ill. App. 3d 1041, 1050 (2003). We also note that the evidence reflects that respondent asked J.B. for his belt in order to use it to hit J.H.

- 14 -

lying on the bathroom floor and went and lay down in her bedroom, leaving Sandra H. to attend to him, dress him, and eventually call 911. Additionally, respondent initially lied about the source of his injuries and stated that J.H. had fallen.

¶ 55    We also reject respondent's argument that the trial court's finding was against the manifest weight of the evidence because there was only a single incident instead of repeated acts. The language of the statute is phrased in the disjunctive, "or." 750 ILCS 50/1(D)(e) (West 2012). Thus, extreme *or* repeatedly cruelty to a child may result in a finding of unfitness. See, *e.g.*, *C.E.*, 406 Ill. App. 3d at 108 (noting that because subsection (b) was phrased in the disjunctive, "any of the three elements may be considered on its own as a basis for unfitness"). At any rate, the evidence also supported that respondent caused the older femur fracture and committed repeated acts of abuse in the past. According to Saluja, the older fracture in J.H.'s leg could not have been caused by minor trauma or J.H. falling over accidentally. Additionally, J.H. informed Holmes that respondent hit him "a lot, all the time," respondent admitted that she had a history of anger management issues with respect to J.H, that she hit him before, that the violence had been going on "for years," and that she would hit him with her fist and tell him "to get away from her." Accordingly, we find that the trial court's decision that respondent was unfit as to J.H. for extreme or repeatedly cruelty was not against the manifest weight of the evidence.

¶ 56    Next, respondent challenges the trial court's conclusion that she was unfit with respect to both J.H. and J.B. based on section 1(D)(g) of the Adoption Act for failing "to protect the child from conditions within his environment injurious to the child's welfare." 750 ILCS 50/1(D)(g) (West 2012). As previously stated, upon determining that at least one basis for unfitness was proper, we need not address the remaining bases found by the trial court. *M.J.*, 314 Ill. App. 3d at 655.

¶ 57    Nevertheless, we note that respondent reasons that the statute contemplates a parent's failure to protect a child from another person, not from the parent herself. In support of her argument, respondent cites only *C.W.*, 199 Ill. 2d 198. We disagree that this case supports her position. In that case, the parent was found unfit under section 1(D)(g) based on her conduct before the children were removed, where the environment included abusive relationships with the children's fathers and the children had bruises at the time of removal. *C.W.*, 199 Ill. 2d at 201-04, 215. Our supreme court held that it was irrelevant for purposes of section 1(D)(g) whether the parent failed to correct or improve the injurious conditions after removal of the child (although this would be relevant to an unfitness finding under other sections, such as section 1(D)(m)). *C.W.*, 199 Ill. 2d at 212-13, 218. Under section 1(D)(g), the parent's conduct before removal was "precisely the kind of evidence a court must consider in making a determination under" this section. *Id.* at 215. As the court explained, evidence of a parent's completion of DCFS services or refrainment from objectionable conduct after the child has been removed "does not somehow absolve or erase" the initial conduct which led to removal of the child. *Id.* at 217.

¶ 58    We find that the plain language of the statute does not support respondent's argument or her interpretation of section 1(D)(g). The statute specifically refers to a parent's failure to protect a child from "*conditions* within his environment" that are injurious to the child's welfare. It does not state that a parent can only be found unfit if he or she fails to protect a child from "another person," and it also does not exclude the possibility that a parent may be found unfit for failing to protect a child from the parent, herself. Moreover, cases applying this

- 15 -

subsection have found a parent unfit for failure to protect a child from injurious conditions even when those conditions arose from that parent's conduct. See, *e.g.*, *In re S.B.*, 348 Ill. App. 3d 61, 65-66 (2004) (holding that unfitness for failure to protect a child from injurious conditions was supported by evidence of the mother's long-term absences, substandard care of her children, and beatings of two of the children). Therefore, as directed in *C.W.*, the relevant evidence under this section consists of respondent's conduct and the injurious conditions which existed before the children were removed from her home. We decline respondent's invitation to carve out an exception to section 1(D)(g) for circumstances where it is the parent herself who is causing an injurious environment. In addition, the court in *C.W.* held that "there is no requirement under section 1(D)(g) that a parent be permitted a period of time to correct or improve an injurious environment before he or she may be found unfit on this ground." *C.W.*, 199 Ill. 2d at 216. Accordingly, respondent was not entitled to a set period of time after the petitions were filed in order to remedy the injurious environment.

¶ 59        In ruling, we note that, besides arguing that section 1(D)(g) is inapplicable to her case, respondent raises no challenge to the trial court's factual findings with respect to this section. And as previously stated, the evidence established that respondent severely beat J.H., while in J.B.'s presence, and she requested that J.B. give her his belt so that she could hit J.H. with it. Evidence regarding unfitness as to J.H. may be used to support a finding of unfitness as to J.B. *Janine M.A.*, 342 Ill. App. 3d at 1050.

¶ 60        Next, respondent contends that the trial court also erred in finding her unfit as to both minors based on depravity. However, as previously stated, upon determining that at least one basis for unfitness was proper, we need not address the remaining bases found by the trial court. *M.J.*, 314 Ill. App. 3d at 655. In this case, we have already concluded that the trial court properly found her unfit as to both minors for failure to maintain a reasonable degree of interest, concern, or responsibility as to the minors' welfare, and for failure to protect the minors from conditions injurious to their welfare, and as to J.H. for extreme or repeated cruelty. Thus, we need not address this remaining issue on appeal.

¶ 61        Nevertheless, even if we were to address her contention, we would conclude that the trial court's finding was not against the manifest weight of the evidence. While depravity is not defined by the Adoption Act, our supreme court has held that it "consists of an inherent deficiency of moral sense and rectitude." (Internal quotation marks omitted.) *In re Adoption of K.B.D.*, 2012 IL App (1st) 121558, ¶ 200. Further, depravity may consist of "a series of acts or a course of conduct which indicates a deficiency in a moral sense and shows either an inability or an unwillingness to conform to accepted morality. [Citations.]" (Internal quotation marks omitted.) *Id.* Here, the trial court's conclusion was not against the manifest weight of the evidence as it based its decision on the severe beating inflicted by respondent on her eight-year-old son, the extent of which we need not review again, and there was evidence that respondent had been physically abusing J.H. for years. We also defer to the trial court's determinations regarding witness credibility and what inferences to draw from the evidence with respect to Saluja's testimony regarding J.H.'s older femur fracture. Moreover, we are unpersuaded by respondent's argument that she did not act in a depraved manner because she called 911 and expressed remorse. The evidence indicated that she did not stop beating J.H. until another adult intervened, she did not immediately call 911, she left him on the bathroom floor and lay down on a bed, and she initially claimed that he fell while doing squats.

¶ 62    Lastly, we note that the public guardian and the State argue that respondent has forfeited any challenge to the trial court's best interests determination because she failed to present any argument in her brief on appeal in that regard. We agree; other than brief references to the trial court's best interests determination, respondent presents no argument challenging this holding on appeal. Ill. S. Ct. R. 341(h)(7) (eff. Feb. 6, 2013). "[T]his court has repeatedly held that the failure to argue a point in the appellant's opening brief results in forfeiture of the issue. [Citations.] *** An issue that is merely listed or included in a vague allegation of error is not 'argued' and will not satisfy the requirements of the rule." *Vancura v. Katris*, 238 Ill. 2d 352, 369-70 (2010).

¶ 63                                III. CONCLUSION

¶ 64    For the reasons stated, we affirm the judgment of the circuit court of Cook County.

¶ 65    Affirmed.