2021 IL App (2d) 200492-U
No. 2-20-0492
Order filed February 19, 2021

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(l).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| In re N.T., Minor. | ) | Appeal from the Circuit Court |
| | ) | of Winnebago County. |
| | ) | |
| | ) | No. 18-JA-111 |
| | ) | |
| (The People of the State of Illinois, | ) | Honorable, |
| Petitioner-Appellee, v. Darius T., | ) | Francis Martinez        , |
| Respondent-Appellant). | ) | Judge, Presiding. |

JUSTICE McLAREN delivered the judgment of the court.
Justices Jorgensen and Brennan concurred in the judgment.

**ORDER**

¶ 1     Held:     The State did not prove by clear and convincing evidence that respondent was unfit to be the minor's parent due to his failure to make reasonable progress toward the goal of return home; because the unfitness finding was against the manifest weight of the evidence, we reverse the judgment of the trial court terminating respondent's parental rights.

¶ 2     The trial court found respondent, Darius T. to be an unfit parent and ruled that it was in the best interest of his minor child, N.T., to terminate his parental rights. Respondent appeals only the unfitness finding.[1] For the reasons that follow, we reverse.

_____

[1] This is an accelerated appeal pursuant to Illinois Supreme Court Rule 311(a) (eff. Mar. 8,

¶ 3                                   I. BACKGROUND

¶ 4     Preliminarily, we note that respondent failed to file an appendix containing a table of contents of the record on appeal.  See Illinois Supreme Court Rule 342 (eff. Oct. 21, 2019) ("appellant's brief shall include, as an appendix, *** a complete table of contents, with page references, of the record on appeal").  Respondent's omission has made disposing of this case unnecessarily difficult.  Respondent is admonished to pay strict attention to the Supreme Court's rules in any future appellate filings.

¶ 5     On April 27, 2018, the State filed a petition alleging that six-year-old N.T. was a neglected minor because his environment was injurious to his welfare.  The petition was predicated on allegations of domestic abuse between N.T.'s mother and the father of N.T.'s sibling, and protective custody was taken of N.T.  Although respondent was identified in the petition as N.T.'s father, he was not living with N.T. at the time that DCFS involvement began. He was incarcerated and not involved in the reason the case came into care.

¶ 6     Respondent attended, in the custody of the Department of Corrections, the adjudicatory hearing on July 30, 2018.  N.T.'s mother and the father of N.T.'s sibling stipulated to neglect; respondent waived his right to a hearing.  N.T. was adjudicated a neglected minor on that day.

¶ 7     At the dispositional hearing on September 6, 2018, respondent was represented by court-appointed counsel.  The parties entered into an agreement placing guardianship and custody of N.T. and his sibling with DCFS.  The court admonished the parents that they must now "engage

_____

2016).  Our disposition was due 150 days after the filing of the notice of appeal, or January 25, 2021.  However, because we granted the State's agreed motion for an extension of time to file its brief and set a new briefing schedule, good cause is shown for the delay in filing the disposition.

in services and make reasonable efforts and progress" towards reunification. Respondent was told: "you're in the Department of Corrections. You must engage in whatever services are available to you that are recommended or requested by the agency." The State indicated that integrated assessments and service plans had yet to be submitted.

¶ 8     A hearing on the status of the integrated assessments was held on November 13, 2018. Respondent was again present, in DOC custody. The court learned that no integrated assessment had been completed. In continuing the case for further status on December 21, 2018, the court directed DCFS to have an assessment for all parties completed within 30 days, and service plans to be tendered "within 7 days." The court excused respondent's presence at the December 21, 2018, status hearing.

¶ 9     Respondent's Integrated Assessment, filed on December 21, 2018, notes no disclosed history of abuse or domestic violence and no prior DCFS involvement. The assessment states that he is currently incarcerated for possession of a firearm by a gang member, projected to be released on June 22, 2022, and discharged on June 22, 2024. He has a history of substance abuse, including alcohol, cocaine, and hallucinogens. The Integrated Assessment recommends that respondent (1) complete substance abuse services while incarcerated through the Illinois Department of Corrections; (2) complete vocational/job preparedness classes while incarcerated to prepare for release; (3) complete recommended counseling for mental health and/or anger management' and (4) complete any services recommended by the Department of Corrections counseling staff to prepare for release.

¶ 10     The first DCFS Family Services Plan, also filed December 21, 2018, notes that respondent has "expressed a willingness to participate in services." One "Desired Outcome" identified in the plan is "to maintain a positive relationship" with N.T. "[t]hrough consistent and appropriate

visitation." The plan then references a "critical decision" to place parent/child visitation on hold as respondent and N.T. had not met before, respondent is not scheduled for release until 2022, and "[i]t has been determined that a correctional facility is not an appropriate setting for [them] to build a healthy relationship." The evaluation statement notes that respondent "has not participated in visitation" due to this decision.

¶ 11    The other "Desired Outcome" states: "[Respondent] will cooperate with DCFS and this worker's agency in order to successfully complete services and move toward case closure." The service plan does not list recommended services. The "Evaluation Narrative" concludes that "[respondent] has not made progress in services or visitation due to his incarceration."

¶ 12    The case manager with Children's Home and Aid assigned to the case, Bryan Rilott, appeared in court at the status review on December 21, 2018. Pursuant to the court's directive, Rilott stated that he would send respondent an "updated copy of the service plan." The record indicates that this was the first services plan that DCFS provided to respondent.

¶ 13    The second DCFS Family Services Plan, filed on February 8, 2019, simply notes with respect to services that "[respondent] is currently incarcerated." The associated Permanency Hearing Report, prepared by Children's Home and Aid, recommends that respondent "complete vocational/job preparedness classes while incarcerated to prepare for release." The report further states that respondent "is on the waiting list to participate in substance abuse counseling while incarcerated" and that this is the only recommended service currently available to him. With respect to visitation, the second services plan reiterated that due to the agency's "critical decision," visitation is not possible.

¶ 14    The court found that respondent had made reasonable efforts:  "He's engaged in the service that is available to him, hopefully more services will become available to him."  The goal was set for N.T. to return home within 12 months.

¶ 15    Respondent attended in DOC custody the permanency review hearing held on February 11, 2019, and was represented by court-appointed counsel.  No witnesses were presented; instead, the parties decided to stand on the hearing report.

¶ 16    The third services plan was filed on July 18, 2019.  The agency's Permanency Hearing Report filed that day states that "[o]nce released, [respondent] would be recommended to engage in mental health services, vocational training, and any other recommended services."  The agency "needs to find out" the current status of his participation in services.  In summarizing respondent's progress, the July 18, 2019, service plan notes that the agency worker has been in contact with [respondent's] counselor at the correction facility, respondent has limited access to services at this time, and respondent has not responded to agency correspondence but has signed consents to release information that were sent to his correctional counselor.  The plan also notes that the agency worker must request to be allowed to meet with respondent at the facility, that he has not done so, and that the "agency needs to meet with [respondent] in person."  The plan additionally notes that respondent "has expressed a desire to have a relationship with his child and has attended all required court dates."  He needs to complete a substance abuse program if requested by the worker and to comply with all recommendations.

¶ 17    Respondent was present in custody of the DOC for the July 23, 2019, hearing review, which was continued to September 10, 2019.  Respondent was also in attendance on September 10, 2019, again represented by court-appointed counsel.

¶ 18    The Children's Home & Aid report to the court, filed on September 6, 2019, notes that respondent has been moved to the Kewanee Correctional Facility, also listed as the Kewanee Life Skill Re-Entry Center.  The report states that "[d]ue to recent clarification that decisions by the agency are not sufficient to not allow parent-child visitation," the agency will be required to set up a visitation plan unless the court rules otherwise.  The agency spoke with respondent's correctional counselor "8/2019" to set up a visitation plan and sent a letter to respondent "8/2019."  This correspondence was the first agency contact with respondent since the case changed workers in "6/2019."  Responding to the agency letter, respondent agreed that he would like visitation with his son, and wrote an "appropriate letter" to N.T.  The agency will request that respondent write letters to N.T. "for a period of time before visitation is established."

¶ 19    The report concludes, with respect to visitation, "[respondent] has not made satisfactory progress on the issue of visitation, but this is not due to action or lack of action by the parent."  The report further notes that respondent "has been given limited opportunity to display cooperation" as the agency "did not make monthly attempts to contact [him] during this review period."  With respect to substance abuse, the report states "[i]t is unknown if [respondent] is currently engaged in substance abuse services at the prison."

¶ 20    The fourth family services plan, also filed on September 6, 2019, acknowledges neither the agency's change in visitation rules nor the August 2019 communications between the agency and respondent and between respondent and N.T.  With respect to recommended services, the  plan lists "complete parenting classes if recommended by the agency" and "complete substance abuse assessment if requested by the worker and *** comply with all recommendations."  The court determined that respondent had made reasonable efforts but not progress," stating that he has done "what he can and that is very good"; "at this point we do not have the progress necessary to find

fitness." The court declined the State's recommendation to change the goal to substitute care and maintained it as "return home."

¶ 21    The fifth and, for present purposes, final family service plan, filed on December 26, 2019, adds "parent coaching" services to the reasons the case remains open. The plan also notes that respondent is able to participate in group counseling services "from the Kewanee Life Skill Re-Entry Center." The Permanency Hearing Report filed on December 26, 2019, states that, although respondent had not yet been provided with a visit with N.T., he was communicating with him once a month via mail, and the agency was communicating with respondent once a month. Respondent was cooperative with the agency during this review period. The current DCFS case worker, Idriss Mouity, learned from respondent's assigned social worker that respondent had completed "Communication 1, Computer Concepts, Essential Learning (GED prep), Financial Literacy 1 and 2, Interpersonal Skills, Keyboarding, Language Arts, and Career Readiness." He was also on a waiting list for "Thinking for a Change Drug Treatment or Drug and Alcohol Education, and Inside Out Dads."

¶ 22    At the permanency review hearing on January 3, 2020, the parties asked the court to take judicial notice of the report. Respondent's counsel proffered the additional information that respondent had started parenting classes "this week." Counsel further pointed out that although respondent's projected parole date was now scheduled "for February of 2022," that "may change dependent upon how he progresses in various services in the department of corrections."

¶ 23    Following argument, the court cited the objective standard for determining progress and concluded that respondent has made reasonable efforts but due to his incarceration does not "have the ability to essentially engage in what is necessary to make progress in reunification." Given respondent's "unfortunate circumstances of being with the department of corrections," the court

could "only find that it is in the best interest of [N.T.] to achieve permanency by changing the goal to Substitute Care Pending Termination of Parental Rights."

¶ 24    The State filed a motion for termination of parental rights on February 6, 2020. With respect to respondent, the motion alleged four counts:  respondent has (1) "failed to maintain a reasonable degree of interest, concern or responsibility as to the child's welfare"; (2) "failed to protect the minor from conditions within the environment injurious to the child's welfare"; (3) "failed to make reasonable efforts to correct the conditions that caused the child to be removed during a nine (9) month period after an adjudication of neglected or abused minor"; and (4) "failed to make reasonable progress toward the return of the child to him during a nine (9) months [sic] period after an adjudication of neglected or abused minor."  The motion further alleged that it was in the best interest and welfare of N.T. that respondent's parental rights be terminated.

¶ 25    Respondent attended the unfitness hearing, which began on February 28, 2020.  The State's first witness was caseworker Idriss Mouity, who testified that he took over N.T.'s case in "April 2019."  His responsibilities included making reports and service plans, including for N.T., and he identified the filed integrated assessment and service plans in the case.  When the State moved to admit these documents, respondent's counsel objected on the ground that some of the service plans bore the same preparation date and appeared to be "duplicative."  The court stated that it would take respondent's objection under advisement and, if it later turned out that the plans were identical, would admit the original and strike the copies.  The court further stated that it would resolve the issue on the record when it made its unfitness determination.

¶ 26    Mouity testified that he started to work with respondent "from August last year."  Although he had corresponded with respondent and his counselor, he began monthly visitation with respondent and N.T. in February 2020.  He did not know whether respondent had engaged in

substance abuse treatment or whether domestic violence counseling was available to respondent. He had received a report that respondent "is doing some GED classes." He stated that according to respondent's counselor, he on a waiting list for mental health counseling and parenting classes. Every month since August 26, 2019, respondent "sent a lot of pictures, sent letters, letters to reach out to his son," including a birthday card in December. Mouity did not know respondent's release date or parole date.

¶ 27 The State next called Bryan Rilott, who testified that he has been a caseworker for Children's Home and Aid for two years and was assigned to the present case from an unspecified date in 2018 until April 2019. Rilott stated that he had mailed respondent a service plan, his business card, and a letter, but he could not recall when he did this or whether he made subsequent efforts to contact respondent. He never visited respondent in person, although he spoke with respondent's counselor at DOC "multiple times." The counselor was aware of Rilott's contact information, but respondent did not respond to Rilott's letter while Rilott was case manager.

¶ 28 The DOC counselor advised Rilott that respondent was on a "long" waiting least for substance abuse treatment; he also mentioned "a life skills class for post release and job searching." When asked about GED classes, Rilott responded that they were offered at the DOC, but he was not sure if respondent was enrolled. He could not recall if GED classes were specifically in the service plan for respondent.

¶ 29 Finally, the State called Samantha Creeger, who stated that she was employed by Children's Home and Aid in a supervisory role and was involved in N.T.'s case. She described what is in the service plan for respondent: "do substance abuse treatment, an assessment, and the treatment if recommended, and then it included parenting classes if recommended and *** some basic tasks such as cooperating with the agency, cooperating with his legal obligations, visitation

with his child and I believe that was it." She was aware that respondent was on a waiting list for substance abuse treatment but was not sure if that ever became available for him.

¶ 30    She understood that respondent mostly communicated about the services with his counselor; when he reached out to the agency via letter, it was "more about the visitation with his son and things like that." Creeger stated that other than respondent's letters, she was unaware of any involvement with N.T. prior to the February 2020 visitation. When asked about respondent's involvement with N.T. before the case came into care, Creeger responded, "We don't know for sure, *** but from what has been reported, little or no involvement."

¶ 31    Respondent elected not to testify. The court was asked to take judicial notice of the records relating to respondent's attendance at the court proceedings. The court took notice, commenting that it "goes to a reasonable degree of interest, obviously, coming to court for your child." The parties made oral arguments.

¶ 32    On July 31, 2020, the court rendered its decision, finding that the State had proven only one of its allegations by clear and convincing evidence:  respondent had failed to make reasonable progress. The court stated that "while the respondent's incarceration does not *per se* allow a finding of failure to make reasonable progress, *** incarceration creates barriers in this case the respondent was to address. And they have been identified in the integrated assessment, the respondent was not able to do that, and has failed to make reasonable progress by clear and convincing evidence."

¶ 33    At a hearing on August 28, 2020, the court determined that it was in the best interests of N.T. to terminate respondent's parental rights.

¶ 34                                   II. ANALYSIS

¶ 35   Respondent argues that the trial court erred in finding him unfit to be N.T.'s parent.  A determination of parental unfitness is the first step in the involuntary termination of parental rights pursuant to the Juvenile Court Act of 1987 (705 ILCS 405/1–1 *et seq.* (West 2020) and must be based upon clear and convincing evidence.  See *In re C.N.*, 196 Ill. 2d 181, 208 (2001)(because the termination of parental rights "constitutes a complete severance of the parent-child relationship *** , proof of parental unfitness must be clear and convincing").  "The clear and convincing standard requires proof greater than a preponderance, but not quite approaching the criminal standard of beyond a reasonable doubt."  *In re D.T.*, 212 Ill. 2d 347, 361 (2004).  We will not disturb the trial court's finding of unfitness unless it is against the manifest weight of the evidence. *In re D.F.*, 332 Ill. App. 3d 112, 124 (2002).  The trial court's finding is against the manifest weight of the evidence when the opposite conclusion is clearly evident.  *In re D.L.*, 326 Ill. App. 3d 262, 270 (2001).

¶ 36   The State must prove a parent unfit as defined in section 1(D) of the Adoption Act (Act) (750 ILCS 50/1(D) (West 2020); *In re C.W.*, 199 Ill. 2d 198, 210 (2002).  Under section 1(D)(m)(ii) of the Act, a parent may be found unfit if he or she fails to make reasonable progress toward the return of the child within any nine-month period after an adjudication of neglect.  750 ILCS 50/1(D)(m)(ii) (West 2020).  The statute also provides:

> "[i]f a service plan has been established as required under Section 8.2 of the Abused and Neglected Child Reporting Act to correct the conditions that were the basis for the removal of the child from the parent *and if those services were available*, then, for purposes of this Act, 'failure to make reasonable progress toward the return of the child to the parent' includes the parent's failure to substantially fulfill his or her obligations under the service plan and correct the conditions that brought the child into care during any 9-month period

following the adjudication under Section 2-3 or 2-4 of the Juvenile Court Act of 1987."

(Emphasis added.) 750 ILCS 50/1(D)(m)(ii) (West 2020).

¶ 37    "Reasonable progress is examined under an objective standard based upon the amount of progress measured from the conditions existing at the time custody was taken from the parent." *In re D.T.*, 2017 IL App (3d) 170120, ¶ 17. Failure to make reasonable progress toward the return of the child includes the parent's failure to substantially fulfill his or her obligations under the service plan and correct the conditions that brought the child into care. 750 ILCS 50/1(D)(m) (West 20). "Reasonable progress requires measurable movement toward reunification and occurs when a trial court can expect to order the minor returned to the custody of [his] parents in the near future." *In re J.H.*, 2014 IL App (3d) 140185, ¶ 22.

¶ 38    We begin by addressing two arguments respondent raises on appeal. The first involves respondent's objection at trial to the admission of the various service plans because they appeared to be "duplicative." The court stated that it would take respondent's objection under advisement and, if it later turned out that the plans were identical, would admit only the original and strike the copies. The court further stated that it would resolve this issue on the record when it rendered its unfitness decision. Respondent correctly points out that the court did not resolve the issue on the record and argues that, as a result, "it cannot be ascertained whether the trial court used any of those exhibits as evidence, and if so, which ones as support for its finding of [respondent's] unfitness." Second, respondent argues that if he court relied on the integrated assessment, as opposed to the service plans, in determining respondent's unfitness, such reliance was error.

¶ 39    Our examination of the service plans shows that respondent's information was updated throughout the relevant time period. We further note that specific service plans were never referenced by the parties or the witnesses after their admission at trial. Nevertheless, to the extent

that the trial court erred in not revisiting the issue on the record—and also in relying on the integrated assessment—we find any error to be harmless in light of our reversal of the court's unfitness finding.

¶ 40    We agree with respondent that the State did not prove by clear and convincing evidence that he failed to make reasonable progress during a nine-month period following the adjudication of neglected minor on July 30, 2018.  The State argues that respondent failed to make progress during the entire 17-month period from July 30, 2018, through January 3, 2020.  However, because respondent was not provided with an integrated assessment or services plan prior to the end of December 2018, we consider only the 12 months in 2019.  See *In re Keyon R*., 2017 IL App (2d) 160657, ¶ 32 ("DCFS regulations require both an assessment and the development and implementation of a service plan").

¶ 41    Children's Home and Aid supervisor Creeger described what was in respondent's service plan:  "do substance abuse treatment, an assessment, and the treatment if recommended, and then it included parenting classes if recommended and *** some basic tasks such as cooperating with the agency, cooperating with his legal obligations, [and] visitation with his child."  We note that the agency also consistently recommended that respondent engage in and complete "vocational/job preparedness classes."

¶ 42    The agency prohibited visitation with N.T. due to respondent's incarceration prior to September 2019, at which time it discovered that it was not authorized to disallow parent/child visits.  During the four months remaining until January 3, 2020, respondent followed agency recommendations, sending pictures and writing monthly letters to N.T. in preparation for regular visitation.

¶ 43    In addition to visitation, respondent engaged, or attempted to engage, in all recommended services that were available to him in 2019. By February, he had placed himself on the DOC's long waiting list for substance abuse treatment, where he remained throughout the year. By the end of the year, he was taking parenting classes and had completed "Communication 1, Computer Concepts, Essential Learning (GED prep), Financial Literacy 1 and 2, Interpersonal Skills, Keyboarding, Language Arts, and Career Readiness." He was also on a waiting list for "Thinking for a Change Drug Treatment or Drug and Alcohol Education, and Inside Out Dads." The hearing reports and service plans indicate that respondent was generally cooperative with the agency, except during a review period when he was "given limited opportunity to display cooperation."

¶ 44    The "reasonable progress" standard does not require that a parent complete all required tasks or services during the relevant nine-month period; rather, it requires that a parent take steps toward completing those requirements and, at a minimum, "make measurable or demonstrable movement toward the goal of reunification." See *In re D.F.*, 332 Ill. App. 3d 112, 125 (2002). Where a parent takes "several steps toward completing the services in [his] service plan," he makes a "minimum measurable or demonstrable movement toward reunification" and a court's finding that he failed to make reasonable progress is against the manifest weight of the evidence. See *In re Gwynne P.*, 346 Ill. App. 3d 584, 595-96 (2004). Moreover, when official action frustrates parental efforts, the parent's fitness will be judged by actions that show their intent, rather than by their ultimate success. *In re S.B.*, 348 Ill. App. 3d 61, 67 (2004).

¶ 45    It is well settled that the mere fact of incarceration is not evidence of the failure to make reasonable progress. *In re J.R.Y.*, 157 Ill. App. 3d 396, 403 (1987). Although the trial court acknowledged this rule, it ultimately treated respondent's incarceration as the single cause of his lack of progress. We believe that respondent made more than minimal demonstrable progress

toward reunification. We also note the impact of official actions on respondent's ability to make further progress, namely, the agency's misguided, later rescinded, visitation rule, and DOC's failure to provide adequate services. In evoking the "objective standard" for reasonable progress, the trial court disregarded the objective reality of respondent's predicament: although the State demanded progress, it did not provide the means to attain it. The court's reasoning is counterfactual. Reasonable progress in completing prescribed services is conditioned upon the services being available. See (750 ILCS 50/1(D)(m)(ii) (West 2020)). The evidence establishes that most of the recommended services were unavailable.

¶ 46    Similarly, the State argues that the court could not expect to order N.T. returned to respondent's custody "in the near future" because the recommended services could not be completed until after respondent's release in June 2022. This assertion lacks a factual basis. At the time of the unfitness hearing in February 2020, respondent was on track to begin regular visitation with N.T. He was taking parenting classes and had completed "vocational/job preparedness classes." The State's own witnesses did not know whether substance abuse treatment had begun. Even assuming respondent was still on the waiting list for treatment, the State offered no evidence as to the length of the list, when respondent might begin treatment, or how long treatment might take. Nor did the State contest counsel's statements that the projected parole date had recently been changed to February 2022 and could be further updated depending on respondent's continued progress with services. In short, the State failed to present clear and convincing evidence that the court could not "expect to order [N.T.] returned to [respondent's] custody *** in the near future." *In re J.H.*, 2014 IL App (3d) 140185, ¶ 22.

¶ 47    The State cites to *In re F.P.*, 2014 IL App (4th) 140360, and *In re K.H.*, 346 Ill. App. 3d 433 (2004). Both cases are distinguishable from this one. In *F.P.* the court challenged the caselaw

holding that a minimum measurable or demonstrable movement toward reconciliation is sufficient for a finding of reasonable progress because "it could be years before the parent was prepared for reunification." 2014 IL App (4th) 140360, ¶88 (citing *In re Gwynne P.*, 346 Ill. App. 3d 584 (2004)). The concern of the *F.P.* court that "attending only one half-hour class" would be minimal, though not necessarily reasonable progress, does not apply here. *Id.* In this case, by taking parenting classes and completing "vocational/job preparedness classes," respondent made more than minimal demonstrable movement toward reconciliation. In *K.H.*, the court addressed the potential harm to the child of "perpetual lack of permanency" where the respondent consistently failed to make reasonable progress in overcoming her domestic abuse issues despite the availability of recommended counseling services. 346 Ill. App. 3d at 455. Here, respondent took or completed all available recommended services; the *K.H.* court's concern about a "perpetual lack of permanency" has not been shown to apply.

¶ 48 The interest of parents in the care, custody, and control of their children is the oldest of the fundamental liberty interests guaranteed by law. *In re M.H.*, 196 Ill. 2d 356, 362 (2001). "Consequently, all participants must be vigilant not to relax established standards." *In re Keyon R.*, 2017 IL App (2d) 160657. Because the State failed to prove any ground of alleged unfitness by clear and convincing evidence, we reverse the judgment of the trial court terminating respondent's parental rights.

¶ 49                                    III. CONCLUSION

¶ 50 For the foregoing reasons, the judgment of the circuit court of Winnebago County is reversed.

¶ 51 Reversed.