2025 IL App (1st) 241922-U

Nos. 1-24-1922 & 1-24-2054 (cons.)

Order filed July 28, 2025.

First Division

**NOTICE**: This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| *In re* Ki.G., A.E., and Kr.G., Minors | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Cook County. |
| | ) | |
| Petitioner-Appellee, | ) | |
| | ) | |
| v. | ) | Nos.  19 JA 685 |
| | ) | 19 JA 686 |
| | ) | 20 JA 520 |
| K.G. and M.M., | ) | |
| | ) | The Honorable |
| Respondents-Appellants).[1] | ) | Andrea Buford, |
| | ) | Judge Presiding. |

JUSTICE LAVIN delivered the judgment of the court.
Presiding Justice Fitzgerald Smith and Justice Pucinski concurred in the judgment.

ORDER

¶ 1    *Held*: The State established by clear and convincing evidence that the respondents were unfit to parent their child Kr. G., and the State established by a preponderance of the evidence that it was in the child's best interests that the respondents' parental rights be terminated. Respondent-mother's constitutional statutory challenge was forfeited and regardless meritless. This court affirmed the decision of the circuit court.

---

[1]Only minor Kr. G. is a party to the present appeal.

¶ 2    Respondents Kindall G. and Maggie M., appeal from the circuit court's order terminating their parental rights to their minor child, Kr. G., after finding them unfit and that the termination was in their child's best interests. They each filed separate appeals, which have been consolidated. They now challenge the circuit court's unfitness findings as against the manifest weight of the evidence. Maggie also argues the trial court erred in failing to consider guardianship, or similar options, at the best interests hearing. We affirm.

¶ 3                                    BACKGROUND

¶ 4    We recite only those facts needed for the disposition on appeal. The Department of Children and Family Services (DCFS) became involved in Kr. G.'s case on March 18, 2020, one day after his birth. The State promptly filed a petition to adjudicate Kr. G. a ward of the court and for his temporary custody, alleging he was neglected due to an injurious environment (705 ILCS 405/2-3(1)(b) (West 2020)) and abused because there was a substantial risk of physical injury (705 ILCS 405/2-3(2)(ii) (West 2020)).[2]

¶ 5    The main reason for the alleged abuse and neglect related to Kr. G.'s older sibling, A.E. In its petition, the State asserted that Maggie and Kindall, Kr. G.'s natural parents, already had prior indicated reports for abuse and neglect as to A.E.[3] The petition specifically alleged that on June 28, 2019, A.E. (then age 3) was in their care before he appeared at the hospital with a "significant head injury," including "bilateral retinal hemorrhages, subdural hematomas, multiple bruises and abrasions." Medical personnel opined this was due to "abusive head trauma" and expressed concern that A.E. had been suffocated based on the intensive level of bleeding in his

---

[2]The petition bears a file stamp of March 10, 2020, which we presume to be a scrivener's error given that Kr. G. was not born until March 17, 2020, and the State's Attorney dated the petition March 19, 2020.

[3]Paternity was confirmed as to Kr. G. on July 16, 2021. The record shows Kindall was not the natural father of A.E., born February 18, 2016, or K.G., born February 11, 2014. Maggie is the natural mother of all three children.

brain.[4] The petition alleged Maggie had delayed seeking medical attention for A.E. after he became symptomatic.

¶ 6      An investigation revealed varying reports as to the evolution of A.E.'s injuries, which included the traumatic brain injury, bruises on his body, and a wound on his cheek. Maggie did not know how they came about but reported that several days before his hospitalization, A.E. hit his head on a pole in the park but then returned to playing, and he had previously injured his cheek during a fall. The evening before his hospitalization, she noted A.E. screamed from his bed. On the morning in question, Maggie left the children (A.E. and her other child, K.G., then age 5) in Kindall's care, and on her return home, found A.E. unresponsive and "flopped" on the bed with his eyes open. Medical care for A.E. was reportedly then delayed some five hours, and in addition to the abrasions, he was later found to have possible burns to his body, including on his palms and feet (although Maggie suggested the hospital caused those marks by placing A.E. in braces). Maggie's other child, K.G., reported a different version of events — that he was asleep but heard A.E. fall downstairs while A.E. helped Kindall take out trash. A.E. then cried that his head was "red inside" as Kindall used ice to quell the bleeding; Maggie was then at home lying down and screamed that A.E. could not remain home, while Kindall insisted he could. K.G. suggested A.E.'s cheek injury was from "daddy."

¶ 7      Kindall similarly did not know the origins of A.E.'s traumatic brain injury. On the evening in question, Kindall said he watched the children while Maggie was out but reported they were already sleeping when he arrived, so he had no contact with A.E. or K.G. Kindall

---

[4]"According to section 3 of the Abused and Neglected Child Reporting Act (325 ILCS 5/3 (West 2022)) " 'An indicated report' means a report made under this Act if an investigation determines that credible evidence of the alleged abuse or neglect exists." Alternatively, " 'An unfounded report' means any report made under this Act for which it is determined after an investigation that no credible evidence of abuse or neglect exists." *Id.*

stated that he never watched the children prior thereto, and he left on Maggie's return. Later that day, Maggie called Kindall relaying that A.E. was in the hospital. Kindall went to the hospital but did not remember much because he had been smoking that day and was "super high."

¶ 8    Due to A.E.'s unexplained traumatic brain injury, A.E. was unable to walk and had a limited ability to verbally communicate. In 2019, A.E. was placed in a medical center, where he received 24-hour care.[5] This brain injury prompted DCFS's involvement with A.E. and also his other biological siblings, K.G. and Kr. G.[6]

¶ 9    Two days after the petition was filed as to Kr. G., the court granted DCFS temporary custody of him and appointed him a *guardian ad litem*.[7] On February 28, 2023, the court found the State had proven its allegations of abuse and neglect, thus granting the State's petition at the adjudicatory hearing. At the dispositional hearing held the same day, the court adjudged Kr. G. a ward of the court, finding Maggie and Kindall unable to care for him, and Kr. G. was placed under DCFS custody and guardianship. Although there is no report of proceedings for the adjudicatory and dispositional hearings, the record reflects that the court ordered an evaluation of both parents prior to setting the permanency goal.

¶ 10    A permanency hearing was held on October 26, 2023, reflecting that in August 2022, Maggie and Kindall had another baby, Maggie's fourth. Despite multiple conversations with the DCFS caseworker, Lanisha Mix, who testified, neither parent informed her of the new baby. That baby instead was given to a cousin, their "auntie," who informed Mix of the child's existence almost a year after its birth. Also, in September 2022, a month after the new baby was

---

[5]As of 2024, he still resided there due to his traumatic brain injury.

[6]The record indicates that Maggie and Kindall were arrested and then charged with child endangerment based on A.E.'s injuries, but the charges were dropped due to insufficient evidence. The petition noted that K.G. and A.E. were already in DCFS custody.

[7]Maggie is herself a product of DCFS, having entered its custody at age 5. She moved between multiple foster homes, group homes, and shelters.

born, Kindall reportedly set fire to the couple's bed after placing a pot of boiling grease on the mattress. Maggie ran to the next door neighbor yelling that Kindall was going to kill her. Both parents testified, however, and denied the domestic violence incidents. Maggie asserted it was an "accidental fire." She guessed it was caused by the ashtray containing Kindall's lit-cigar falling onto the bed. Their cousin also reported to Mix that the couple had physical altercations when visiting their most recently born child.

¶ 11     Following evidence and argument, the court found the parents had continued incidents of domestic violence and neither was credible in denying that fact, especially Kindall. The court also found they both hid the birth of their fourth child from DCFS and, further, that DCFS had made reasonable efforts in providing the parents' services. The court ruled the permanency goal was substitute care pending termination of parental rights, noting the parents had "not made reasonable progress in services," and entered an order to that effect.

¶ 12     On December 27, 2023, the State filed a supplemental petition for the appointment of a guardian with the right to consent to adoption, alleging Maggie and Kindall were respectively unfit to parent Kr. G. under 1(D)(b) and (m) of the Adoption Act (Act) (see 750 ILCS 50/1(D)(b), (m) (West 2022)), insofar as they failed to maintain a reasonable degree of interest, concern, or responsibility for Kr. G.'s welfare (750 ILCS 50/1(D)(b) (West 2022)) and failed to make reasonable efforts to correct the conditions that were the basis for his removal and/or failed to timely make reasonable progress toward Kr. G.'s return (750 ILCS 50/1(D)(m) (West 2022). See also 705 ILCS 405/2-29 (West 2022). The State asked that their parental rights be terminated.

¶ 13     An unfitness hearing ensued in July 2024, wherein the State presented testimony from the same DCFS caseworker, Lanisha Mix, who had been assigned the case since December 2020.

The State also entered a number of documentary exhibits into evidence. The court took judicial notice of its abuse and neglect findings, as well as its dispositional ruling, entered on February 28, 2023.[8] The combined evidence revealed the following.

¶ 14     As to Maggie, Mix testified that all the recommended services remained outstanding, despite some participation. Maggie, for example, had not successfully completed individual therapy, a psychiatric examination, or successfully applied what she learned in parenting classes, requiring that she take the classes again. She had not addressed the reasons the children came into DCFS care. Although Maggie completed domestic violence classes, DCFS again referred her for services after abusive incidents between the couple reportedly occurred, even though Maggie denied the domestic violence. Despite the referral, Maggie declined the domestic violence services and never informed DCFS or Mix of completing any other such services. Mix added that Maggie gave birth to her fourth child with Kindall but also never informed DCFS that she was expecting this child.

¶ 15     Although Maggie consistently visited Kr. G. weekly for several hours prior to the permanency hearing, she never achieved unsupervised visitation because Mix believed the child would then be at risk, and Maggie needed constant redirection. Mix testified that Maggie was not attuned to Kr.G.'s needs and did not respect his boundaries. For example, she brought him a birthday cake, then tried to force feed him when he didn't want it. She also was unable to successfully apply what she learned in the parenting classes to interactions with Kr. G. Following the goal change to termination of parental rights, Maggie largely had been unresponsive regarding obtaining the self-pay, community-based services and pursuing the steps needed for

---

[8]The State asked the court to take judicial notice of the dispositional order entered on "February 8, 2023." The State misspoke as to the date, as the order was entered on February 28, not February 8.

reunification. She had not sought updates on her children's well-being. Accordingly, Mix believed termination of Maggie's rights was in Kr. G.'s best interests.

¶ 16    As to Kindall, Mix testified that the recommended services also remained outstanding. Kindall missed three or more sessions of individual therapy and so Mix had to refer him a second time. Although he participated in the second referral, he did not complete the therapy service or address the reasons this case entered the system. Kindall had to be referred for parenting classes five or six times. He did not complete the service because he did not pass the exam or retake the class thereafter. He also was dropped from parenting classes "due to lack [of]] preparation and motivation." In addition, the domestic violence services remained outstanding, as Kindall never even had any assessment. According to Mix, Kindall's visits with Kr. G. were sporadic, always supervised, and during her observations, required lots of redirection, as Kindall became agitated. On cross, Mix clarified that the visits were monthly after the goal change and were consistent. Following the goal change, Kindall also had not set up self-pay services and was largely unresponsive to Mix's overtures regarding steps needed for reunification. There had been no communication for two months prior to the fitness hearing.

¶ 17    Absent any objection, the State entered into evidence the evaluations of Maggie and Kindall by a clinical psychologist (dated August 4, 2023, just before the permanency hearing). According to the reports, one of which we detail in our analysis, both Maggie and Kindall had a low likelihood of making the gains needed to have Kr. G. returned home because they risked being unable to protect Kr. G., who was noted to have language difficulties and past physical challenges. An Integrated Assessment by DCFS from May 2020 recommended that Maggie and

Kindall engage in the aforementioned DCFS services, and emphasized addressing child safety concerns, describing the prognosis of Kr. G.'s return home as low.[9]

¶ 18    The State rested. Maggie testified delineating some of the services she had completed, including parenting and domestic violence classes, claiming one was as recently as 2024.  She entered into evidence some documentary exhibits reflecting this testimony. Maggie said her visits with Kr. G. were going well and largely consistent. They were happy to see each other and thus bonded. She brought Kr. G. cards, gifts, letters, clothing, and food, and he was excited then. She had addressed the reason the case entered DCFS and learned about safety matters, and that kids are young and fragile. In addition to working as a security guard, she completed classes to become a certified nurse's assistant. On cross, Maggie acknowledged that her aunt called police to her home in September 2022 regarding the domestic violence incident, but she denied the details (apparently delineated in a police report) and claimed it was an accident. Maggie further stated she was unaware she had to inform Mix about her most recent pregnancy and claimed she had not been in a relationship with Kindall since 2019, notwithstanding that they had a baby together in 2022.

¶ 19    Although Kindall did not testify, he offered several exhibits into evidence showing participation with some services, including individual therapy, and observational notes on his visits with Kr. G., mainly from December 2022 to September 2023. These notes overall portrayed the visits between Kr. G. and Kindall as consistent, positive and loving.

---

[9]According to the integrated report, Kindall was described as the putative father of Kr. G., as his paternity had not yet been established, and the report gleaned information from other sources because Kindall "had not communicated with [the] Permanency Worker," and was not interviewed.

¶ 20    Following arguments, the trial court found the State had proven by clear and convincing evidence that Maggie and Kindall were unfit under grounds (b) and (m). As to Maggie, the court cited the outstanding services and Maggie's inability to guard child safety. The court stated she had made minimal progress and gained minimal insight from when the case entered the system. The court found her testimony incredible. As to Kindall, the court similarly ruled that he failed to complete required services, failed to address the reason the case entered the system, and visited sporadically while needing "a lot of direction." Citing the exhibit containing the clinical psychologist's report, the court noted that Kindall did not understand why services were necessary or take responsibility for his role in the case entering the system. The court noted the report stated the likelihood of a safe return was low.

¶ 21    Accordingly, the court ruled the parents unfit, and the cause proceeded to a best interests hearing in September 2024, wherein the court took judicial notice of the evidence and findings at the fitness hearing. Mix testified that Kr. G., then age 4, was safely and appropriately placed with a non-relative foster mother, Keyron A., since he was several days old. Keyron assured Kr. G. had all necessities and services, including occupational and speech therapy, and Kr. G. was up-to-date on medical services in a safe and appropriate home without any concerns. Keyron attended the meetings for Kr. G.'s Individual Educational Plan. Kr. G. had Erb's palsy, which would require ongoing occupational therapy.

¶ 22    Mix and Keyron testified that Kr. G. was bonded in the home. He did various activities with Keyron, and was integrated into the extended family, attending birthday parties and vacations. Keyron wanted to adopt Kr. G. because she loved him, and he loved her. She would encourage a continued relationship with Kr. G.'s biological siblings. Kr. G., along with his other sibling, visited A.E. twice a month in the medical center where he resided. On cross, Keyron

stated Kr. G. also could visit with Kindall provided visits were safe, appropriate, and supervised. Keyron explained that after visits with Kindall, Kr. G. was sometimes hard to "deregulate." He would become mean and kick and throw things, which was atypical. On cross by Kindall's counsel, Mix stated that Maggie and Kindall were reportedly married and Maggie was pregnant with twins. Based on the foregoing, Mix believed it was in Kr. G.'s best interests to terminate parental rights so that the child could achieve permanency. The State rested.

¶ 23    Maggie and Kindall testified that it was not in Kr.G.'s best interests that their rights be terminated because their visits with the child went well, they were bonded, and Kr. G. was excited to see them. Maggie testified she could provide for Kr. G.'s needs.

¶ 24    Following evidence and argument, the court found it was in the child's best interests to terminate Maggie and Kindall's parental rights to Kr. G.[10] The court entered an order to that effect, appointing a guardian with the right to consent to adoption of the minor. Thus, the court set the permanency goal of adoption by Kr. G.'s then foster-mother. This consolidated appeal followed.

¶ 25                                    ANALYSIS

¶ 26    Although parents have a fundamental due process right to the care, custody and control of their children, that right is subject to termination. *In re M.H.,* 196 Ill. 2d 356, 362-63 (2001). The involuntary termination of parental rights involves a two-step process, wherein the State must first prove by clear and convincing evidence that the parent is "unfit," and if found unfit, the court must next consider whether it's in the child's best interests to terminate parental rights. 750 ILCS 50/1(D) (West 2024)); *In re J.B.*, 2014 IL App (1st) 140773, ¶ 49. If a single alleged ground for unfitness is proven, a parent's rights may be terminated, and this obviates the need to

---

[10]In the same hearing, the court also terminated the parental rights of Maggie to A.E. and K.G., after finding her unfit to parent them. Maggie does not challenge that determination on appeal.

consider other unfitness grounds. *Id*.; *In re M.J.,* 314 Ill. App. 3d 649, 655 (2000). At the best interests stage, the State must prove by a preponderance of the evidence that termination is in the child's best interests. *In re T.A.*, 359 Ill. App. 3d 953, 961 (2005).

¶ 27 We will not disturb an unfitness or best interests finding unless it's contrary to the manifest weight of the evidence and the record clearly demonstrates that the opposite result was proper. *J.B.*, 2014 IL App (1st) 140773, ¶ 49; *T.A.*, 359 Ill. App. 3d at 961. Because child custody cases like the present are delicate and difficult, wide discretion resides in the juvenile court to an even greater degree than normal. *In re M.W.*, 2019 IL App (1st) 191002, ¶ 50. We thus defer to the trial court's factual findings and credibility assessments, and we will not reweigh the evidence anew on appeal. *J.B.*, 2014 IL App (1st) 140773, ¶ 49.

¶ 28 *Kindall's Appeal*

¶ 29 We first note that at the fitness hearing, the court took judicial notice of its previous order adjudicating Kr. G. neglected due to an injurious environment and abused because there was a substantial risk of physical injury. See 705 ILCS 405/2-21 (West 2022); 705 ILCS 405/2-3(1)(b) (West 2022); 705 ILCS 405/2-3(2)(ii) (West 2022); *In re M.D.*, 2022 IL App (4th) 210288, ¶ 80; see also *In re Arthur H*., 212 Ill. 2d 441, 465-66 (2004) (noting, the focus at the adjudicatory hearing is on whether the child was abused and neglected, not whether the parents were abusive or neglectful). It also took judicial notice of its dispositional order entered the same day, February 28, 2023, adjudging Kr. G. a ward of the court in DCFS custody and guardianship because Maggie and Kindall were unable to care for him. See 705 ILCS 405/2-22 (West 2022).

¶ 30 At the fitness hearing, the court thus noted its previous findings that Maggie and Kindall failed, whether intentionally or unintentionally, to exercise the level of care required by the circumstances to fulfill their parental duties towards A.E., who was severely injured. They had

not ensured a safe and nurturing environment for A.E., making it also impossible to ensure the same for Kr. G., who was likewise at risk for severe physical injury. See *In re A.P.*, 2012 IL 113875, ¶ 25; *In re An. W.*, 2014 IL App (3d) 130526, ¶¶ 57-58 (noting, a trial court "need not wait to take action until after each particular minor suffers an injury"). Neither parent appealed those findings, nor does the present record contain the report of proceedings for those hearings. See *In re Jaron Z.*, 348 Ill. App. 3d 239, 253 (2004) (noting, a dispositional order is a final order from which an appeal properly lies, and a parent's failure to file a notice of appeal therefrom fails to perfect review of that order or of the neglect proceedings).

¶ 31    Before and after the dispositional order, the court also had identified a number of DCFS services for the parents to engage in to correct the conditions that brought Kr. G. into DCFS's care so they could regain custody of him.[11] See 705 ILCS 405/2-23(1)(c) (West 2022). In addition, the court made credibility findings at the permanency hearing, after Kindall and Maggie testified and in spite of their denials, that domestic violence had occurred between the couple in 2022 when Kindall set fire to Maggie's mattress and that they had hidden the birth of their new child. Neither party challenged those credibility findings then. See *In re Curtis B.*, 203 Ill. 2d 53, 63 (2002) (noting permanency orders may be subject to interlocutory review). The court also implicitly rejected Maggie's similar denial at the fitness hearing regarding domestic violence. Thus, to the extent Kindall now challenges the reasons Kr. G. entered the system in the first place, the existence of an unsafe environment, or the existence of domestic violence

---

[11]The DCFS service plans for Kr. G. from 2021 to 2023 show that the goal was either return home pending a status hearing, or temporary custody with right to consent. Absent the full report of proceedings for all status hearings, we presume the parties were informed that they had to cooperate with DCFS, comply with the terms of the service plans, and correct the conditions which required Kr. G. to be in DCFS care, or they would risk the termination of their parental rights. See 705 ILCS 405/2-10(2) (West 2022) (requiring such an admonishment if the child is placed in the temporary custody of DCFS); *Foutch v. O Bryant*, 99 Ill. 2d 389, 391-92 (1984) (noting, an appellant has the burden to present a sufficiently complete record of the proceedings at trial to support a claim of error).

between the couple, we reject those claims. They are forfeited or consist of credibility findings by the trial court that we are not at liberty to disturb.[12] See *People v. Blair*, 215 Ill. 2d 427, 444 n. 2 (2005); *J.B.*, 2014 IL App (1st) 140773, ¶ 49.

¶ 32     Turning to the main merits, Kindall challenges the trial court's fitness findings under section 1(D)(b) of the (Act) (see 750 ILCS 50/1(D)(b) (West 2024)), where the court found Kindall failed to "maintain a reasonable degree of interest, concern or responsibility as to [Kr. G.'s] welfare" (750 ILCS 50/1(D)(b) (West 2024)). Section 1(D)(b) is phrased in the disjunctive, meaning that any of the three elements (interest, concern, or responsibility) may be considered on its own as a basis for unfitness. *In re S.C.-G.*, 2025 IL App (1st) 241168, ¶ 51. A ground (b) finding warrants a subjective analysis focused on the reasonableness of a parent's efforts while taking into account their difficulties and circumstances. See *In re Nicholas C.*, 2017 IL App (1st) 162101, ¶ 24. Simply because a parent exhibits some interest or affection towards his/her children is not sufficient to support a finding of fitness; rather, his/her interest, concern, and *responsibility* must be reasonable. *In re M.I. v. J.B.*, 2016 IL 120232, ¶ 30; *In re Je. A.*, 2019 IL App (1st) 190467, ¶ 50. The failure to comply with service plan directives is tantamount to objectively unreasonable interest, concern, or responsibility as to the child's welfare. *In re M.J.*, 314 Ill. App. 3d 649, 657 (2000); *In re Za. G.*, 2023 IL App (5th) 220793, ¶ 36, 42. There is no evidentiary time limitation in considering the respondent's unfitness under section 1(D)(b), and as such, a parent's conduct may be considered in total. *Je. A.*, 2019 IL App (1st) 190467, ¶ 50; *Nicholas C.*, 2017 IL App (1st) 162101, ¶ 24; see also *In re Dominique W.*, 347 Ill. App. 3d 557, 567-68 (2004) (noting, conduct before and after the termination petition is filed may be considered).

---

[12]Notably, at the fitness hearing Kindall's theory of defense was that he had engaged in DCFS services. He did not challenge that services were needed.

¶ 33    Here, Kindall's lack of substantial compliance with the service plans over three years and his domestic violence incidents supported the unfitness finding under ground (b). See *Je. A.*, 2019 IL App (1st) 190467, ¶ 53; *Nicholas C.*, 2017 IL App (1st) 162101, ¶¶ 29-31. In particular, Kindall required individual therapy, domestic violence services, child safety assessment services, and completion of the parenting classes, among other services. Yet, by the time of the unfitness hearing, Kindall had been rated unsatisfactory in multiple service plans between June 2022 and May 2024 (with observation dates of 6/10/2022, 12/14/2022, 6/6/2023, 12/23/2023), specifically, as to individual therapy and parenting. He failed to address the reasons the case entered the system, as he simply did not understand how his son became a ward of the court, nor did he address the presence of risk factors, or future safety planning. Individual therapy remained necessary. He did not make himself available for a child family team meeting, as requested.

¶ 34    As to parenting classes, according to service plans from 2022 to 2024, Kindall failed the exam. By December 2022, he had been dropped from the service three times for lack of "participation and motivation." An early service plan, with an observation date of June 10, 2022, also reflects that Kindall was unprepared in class and would "wing information" during the group discussions. The clinical psychologist report entered into evidence, and on which the trial court relied, states that Kindall acknowledged failing to timely sign class-related paperwork and submit requested records, as well as being late to class. He stated "there was not much for him to learn." He never completed the parenting service.

¶ 35    As set forth, in 2022, prior to the adjudication and dispositional hearings, Maggie and Kindall engaged in domestic violence, in addition to having another baby, whose existence they hid from DCFS for a year. Despite that incident, Kindall never participated in a domestic violence assessment. Mix testified that she referred Kindall for that assessment three times, and

the clinical psychologist report from August 2023, mentioned above, also contained a recommendation. That report stated Kindall had a history of unstable relationships with multiple women, conflict patterns that included physical violence or aggression, plus a lack of transparency, insight, and accountability as to this case. This affected his decision-making. According to the report and Kindall's clinical interview, for example, Kindall learned that his child by another woman had been sexually abused by her boyfriend. Kindall acknowledged he failed to inform authorities of the matter. Given the evidence delineated above, the clinical psychologist concluded it was unlikely Kindall could protect Kr. G. and there was risk of maltreatment, especially since Kr. G. had unique language difficulties and past physical challenges. Thus, Kindall's failure to address domestic violence issues directly impacted his parenting ability.

¶ 36    Significantly, once the goal changed to termination of parental rights, Kindall did not participate in services. See *Curtis B.*, 203 Ill. 2d at 62 (noting, once the permanency goal changes to termination of parental rights, DCFS is no longer obligated to provide reunification services). During visits with Kr. G., the case worker Mix had to redirect Kindall repeatedly, and he never achieved unsupervised visits. The trial court implicitly credited her testimony, and Kindall's documentary evidence did not necessarily contradict Mix's testimony.

¶ 37    In arguing that the evidence did not demonstrate his unfitness, Kindall stresses that he consistently visited Kr. G. To the extent he missed any visits, it was due to external circumstances like his inability to pay for public transportation and his car accident around September or November 2022. Kindall points to certain parenting classes taken or therapy engaged in. He asserts the reasonableness of his behavior must be viewed in context, and any shortcomings reflect more on DCFS's incapacity than his own. We cannot agree.

¶ 38     Here, the trial court could conclude, and the record supports, that notwithstanding Kindall's clear interest in his child, his efforts, and some extenuating personal circumstances, he did not undertake the *responsibility* needed to adequately parent Kr. G. See *In re L.G.*, 2025 IL App (1st) 241464, ¶¶ 30-36; *In re E.O.*, 311 Ill. App. 3d 720, 727-728 (2000); see also *Jaron Z.*, 348 Ill. App. 3d at 259-60 (noting, we accord great deference to the trial court's unfitness finding). Notably, Kindall's failure to engage in the parenting services was manifest long before his car accident, as was his inability to understand how the case entered the system or that he needed to fully complete services to regain custody. Moreover, he fails to point to any documentation of how the car accident or similar occurrences impacted his ability to fulfill DCFS services. The total record shows that Kindall's failures were caused not primarily by obstacles beyond his control but an inability to prioritize Kr. G.'s welfare were he to be returned home. See *In re S.C.-G.*, 2025 IL App (1st) 241168, ¶ 54; *E.O.*, 311 Ill. App. 3d at 728. The trial court weighed the evidence proffered and clearly found the State's evidence more compelling.

¶ 39     Kindall further claims that the therapy mandate, per the DCFS service plan, required him to admit that he injured A.E. or that he allowed others to do so, in violation of his fifth amendment right against self-incrimination. See *In re A.W.*, 231 Ill. 2d 92, 107-08 (2008) (noting, "the fifth amendment right against self-incrimination applies to juvenile proceedings" and a service plan "may not compel counseling or therapy requiring the parent to admit to committing a crime"). He argues that evidence should therefore be discounted under ground (b).[13]

---

[13]Kindall argues that the appellees' failure to respond to this argument and others constitutes a concession. Although that may sometimes be the case (*Vukusich v. Comprehensive Accounting Corp.*, 150 Ill. App. 3d 634, 644 (1986)), reviewing courts are never bound by a party's concession. See *People v. Durdin*, 312 Ill. App. 3d 4, 6 (2000); *People v. Stewart*, 66 Ill. App. 3d 342, 354 (1978).

¶ 40    However, the service plans did not necessarily encompass an admission of guilt, as they mandated individual therapy to address what brought Kr. G. to DCFS's attention, with a specific emphasis on "safety concerns," well-being, and parenting. The service plans required that Kindall discuss "parental safety factors, parental stressors, [and] past trauma experiences" in order to reunify with his son.[14] Under the service plans, the trial court thus ordered Kindall to engage in effective counseling or therapy, which is entirely permissible. See *id*. at 108. The record does not support that Kindall was forced to admit past wrongdoing in order to advance in therapy, or that, as Kindall argues, addressing parental safety factors was "too vague" or "amorphous to be achieved." This could have involved conversations about how best to discipline a child, such as with a time-out, rather than striking him. Notably, Kindall does not deny reports stating that he was with Maggie's children just prior to discovering A.E. unresponsive with a traumatic brain injury.

¶ 41    For the reasons stated, the court's conclusion that Kindall was unfit to parent Kr. G. under ground (b) was not against the manifest weight of the evidence. This obviates the need to consider Kindall's challenge to the fitness finding under ground (m) (750 ILCS 50/1(D)(m) (West 2024)). See *J.B.*, 2014 IL App (1st) 140773, ¶ 49; *M.J.,* 314 Ill. App. 3d 649, 655 (2000). Kindall does not otherwise challenge the best interests finding, thus forfeiting it. See *In re M.R.*, 2020 IL App (1st) 191716, ¶ 26.

¶ 42                            *Maggie's Appeal*

---

[14]While early service plans (with observations dates of 6/10/2022 and 12/14/2022) required Kindall to "be transparent on his role as a caregiver when [A.E.] was severely injured," perhaps requiring admissions on his part, they also mandated that he "address the reason why [the] minors came into care and work on correcting the conditions," which as set forth did not necessarily compel self-incrimination. Moreover, apparently pursuant to Kindall's objections, the service plans were amended to focus on safety matters. While Kindall now argues the therapy directives were "too vague and amorphous," he fails to support this claim with any legal authority or demonstrate that he raised this matter in the trial court. See Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020).

¶ 43    On appeal, Maggie challenges the trial court's unfitness finding under 1(D)(b) of the

Adoption Act (Act) (see 750 ILCS 50/1(D)(b) (West 2024)), one of the two grounds cited for

finding her unfit. As set forth, only a single ground of unfitness is needed before parental rights

may be terminated. *J.B.*, 2014 IL App (1st) 140773, ¶ 49; *M.J.,* 314 Ill. App. 3d at 655. Because

Maggie challenges only one ground, her claim as to unfitness is moot. See *In re D.L.*, 191 Ill. 2d

1, 8 (2000); see also *In re V.S.*, 2025 IL 129755, ¶¶ 59-60 (citing *D.L.*, with approval).

¶ 44    Mootness aside, Maggie has not established that the court's order finding her unfit for

failure to "maintain a reasonable degree" of responsibility as to Kr. G.'s welfare was against the

manifest weight of the evidence. 750 ILCS 50/1(D)(b) (West 2024); *J.B.*, 2014 IL App (1st)

140773, ¶ 49; *T.A.*, 359 Ill. App. 3d at 961. As stated, simply because a parent exhibits some

interest or affection towards her children is not sufficient to support a finding of fitness; rather,

her interest, concern, and *responsibility* must be reasonable. *M.I. v. J.B.*, 2016 IL 120232, ¶ 30;

*Je. A.*, 2019 IL App (1st) 190467, ¶ 50.

¶ 45    Maggie next contends that at the best interests hearing, the trial court should have

considered "another permanency option," such as guardianship, rather than terminating her

parental rights because Maggie was bonded with Kr. G. The *guardian ad litem* for Kr. G. first

responds that this court lacks jurisdiction to consider Maggie's claim and asks that we dismiss

the appeal. We disagree.

¶ 46    By statute, a permanency order must be reviewed and reevaluated every six months until

the permanency goal has been attained. 705 ILCS 405/2-28(2) (West 2024); *Curtis B.*, 203 Ill. 2d

at 59-60. Because the obligations set forth therein remain open for reexamination and possible

revision, permanency orders are usually interlocutory and therefore appealable under Illinois

Supreme Court Rule 306(a)(5) (eff. Oct. 1, 2020). *Id.* at 60, 63; *In re Rainy S.*, 374 Ill. App. 3d

1036, 1052 (2007). In this case, however, the permanency goal of termination of parental rights, with the right to consent to adoption, was entered on October 26, 2023, and completed on September 18, 2024. The goal was thus achieved. Maggie filed an appeal within 30 days of the September order, as required by Rules 301 (eff. Feb. 1, 1994) and 303 (eff. July 1, 2017).[15] See *In re A.H.*, 207 Ill. 2d 590, 595 (2003) (noting, an order terminating parental rights and appointing a guardian to consent to adoption is a final order under the Juvenile Court Act of 1987 (705 ILCS 405/2-29(2) (West 2024)); see also *In re Haley D.*, 2011 IL 110886, ¶ 103, Justice Theis concurring (same). Therefore, the September order and any prior nonfinal interlocutory rulings, such as the October 26, 2023, permanency order, became appealable and are properly before this court.[16] See *id.*; *In re Julieanna M.*, 2018 IL App (1st) 172972, ¶ 11.

¶ 47    Although unclear, Maggie now appears to challenge the statutory process that favored adoption over guardianship as a final permanency goal. See 705 ILCS 405/2-28(2)(D)-(E) (West 2024) (noting, the two available forms of permanency are adoption and private guardianship). The statutory scheme, for example, required that adoption had to be ruled out before

---

[15]We note that under Rule 305(e) (eff. July 1, 2017), an appeal from an order terminating parental rights extends an automatic stay of that order until the appeal is complete or the stay is lifted. Adoption with the guardian's consent cannot take place until the stay has been resolved. We further note that Maggie improperly relies, in part, on Rule 304(b)(1) (eff. March 8, 2016), which governs judgments entered as to fewer than all the claims, as a basis for jurisdiction. She also does not provide page citations in support of her facts in the jurisdictional statement, in violation of Rule 341(h)(4) (eff. Oct. 1, 2020).

[16]Notwithstanding that fact, Maggie has specified in her notice of appeal and jurisdictional statement that she is appealing *only* the termination order entered on September 18, 2024. Further, in her reply brief, and in response to the Public Guardian's jurisdictional argument, Maggie insists that she is challenging only the termination order, not the permanency order. She reiterates that at the best interests hearing, the trial court should have considered guardianship instead of terminating her parental rights.

Despite her protestations, Maggie's claim necessarily encompasses a challenge to the October 26, 2023, order, wherein the trial court ruled that the permanency goal was substitute care pending termination of parental rights. It was at that juncture that the court could have considered a request for guardianship, which preserves "residual parental rights and responsibilities" (see 705 ILCS 405/1-3 (West 2024)). From our review, Maggie's contention that the court was required to consider guardianship at the September 2024 best interests hearing *after* it already had found her unfit and thus unable to care for her child appears baseless and lacks legal support. See 705 ILCS 405/2-28(2.3) (West 2024); 705 ILCS 405/2-29(2) (West 2024)); see *infra*. ¶ 48.

guardianship could be considered, thus making adoption the primary choice. *Id.* Further, for adoption to be considered, parental rights had to be terminated. *Julieanna M.*, 2018 IL App (1st) 172972, ¶ 17. Maggie argues those priorities are misplaced — that the court should be able to first consider whether a bond exists between the parent/child, and if so, whether guardianship could preserve that bond. As such, she maintains the statutory scheme was not narrowly tailored or in her child's best interests. As for relief, Maggie claims she does not expect that "Kr. G. will be returned home to her," but asks that we remand the case simply to determine whether an alternative permanency option exists to preserve her relationship with Kr. G. while also providing Kr. G. safety and stability. She clarifies in her reply brief that she is not seeking to once again have custody of Kr. G.

¶ 48    We reject this request. First, Maggie's argument remains underdeveloped and unclear. While she appears to challenge the statutory scheme as unconstitutional, she does not identify the underlying constitutional basis, for example, by specifying whether the statutes in question violate the due process or equal protection clause. In fact, she does not once use the word, "constitutional," in her argument, although she cites cases that do and uses language mirroring such a claim. She thus violates our supreme court rules and the principle that reviewing courts are entitled to have the issues clearly defined, with pertinent authorities cited and a cohesive legal argument presented. Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020); *In re M.M.*, 2016 IL 119932, ¶ 30.

¶ 49    Second, our review of the record reveals she did not raise this constitutional claim at the termination hearing, thus depriving the State, GAL, and trial court of the ability to first consider the matter. In a civil case, a party's failure to challenge the constitutionality of a statute in the circuit court normally forfeits that challenge on appeal. *Forest Preserve Dist. of Du Page County*

*v. First Nat. Bank of Franklin Park*, 2011 IL 110759, ¶ 27; *Jaron Z.*, 348 Ill. App. 3d at 255 (noting, where a party fails to object in the court below, the issue is waived). This is especially true where, as here, the court first entered the permanency goal of substitute care pending termination of parental rights in October 2023, and Maggie could have raised her argument then, but she did not file an interlocutory appeal. Her delay in and willingness to prolong Kr. G.'s custodial instability cuts against her best interests' argument. Moreover, Maggie offers no developed argument that the trial court's decision to terminate her parental rights as being in the best interests of Kr. G. was erroneous or against the manifest weight of the evidence. For these reasons, she has forfeited her claim. See *id.*; *M.M.*, 2016 IL 119932, ¶ 30.

¶ 50    Even forfeiture aside, a nearly identical constitutional claim was raised and rejected in *Julieanna M.*, 2018 IL App (1st) 172972. There, the court wrote:

"The General Assembly *** made a determination that private guardianship is an inferior option for children who cannot be returned to their parents. While the statutes default to the rights of the natural parents—removing a child from the custody of the parents only when necessary—the goals shift when a parent is not able to care for the child. See *In re D.T.*, 212 Ill. 2d at 364. Once a parent is found to be unfit, 'the parent's interest in maintaining the parent-child relationship must yield to the child's interest in a stable, loving home life.' *Id*. Adoption is the only effective way to effectuate that stability, and it enables the child to grow up in a new, permanent family, advancing the child's best interests."

The court continued, stating that guardianship, which is revocable, subjected children to uncertainty in their custodial situation. In short, the court thus held the statutory scheme passed constitutional muster given the competing interests. *Id*. ¶ 28.

¶ 51    Although the statute at issue has been amended, effective February 5, 2025, to mandate greater scrutiny of and flexibility towards choosing guardianship at the permanency hearing (see 705 ILCS 405/2-28 (West Supp. 2025)), the amendment is prospective in nature, specifically beginning on July 1, 2025. Maggie does not cite to the amended statute, let alone offer any argument as to its applicability, thus forfeiting the matter. For the reasons stated, we reject Maggie's request for a remand.

¶ 52    And, pursuant to our thorough examination of the record here, we conclude the trial court's decision to terminate Maggie's parental rights to Kr.G. was not against the manifest weight of the evidence. To the contrary, we agree with the trial court that the evidence clearly shows that it's in Kr. G.'s best interests to be adopted by his long-time foster parent in whose care, among other things, Kr.G.'s physical safety and welfare have been ensured, and where he has developed a sense of identity, attachment, continuity, and stability. See 705 ILCS 405/1-3(4.05) (West 2024); *In re Tajanna O.*, 2014 IL App (1st) 133119, ¶¶ 18-35.

¶ 53                                    CONCLUSION

¶ 54    Based on the foregoing, we affirm the judgment of the circuit court.

¶ 55    Affirmed.